Claude E. CLEETON and Sarah
Cleeton Kakaley

v.

**HEWLETT–PACKARD COMPANY.**

Civ. No. 16092.

United States District Court,
D. Maryland.

March 30, 1972.

Michael P. Crocker, Baltimore, Md., and Paul T. O'Neil, Washington, D. C., for plaintiffs.

Benjamin C. Howard, Baltimore, Md., and Harold J. Birch and Edward F. McKie, Jr., Washington, D. C., for defendant.

FRANK A. KAUFMAN, District Judge:

Plaintiffs, the holders of United States Letters Patents No. 2,452,549 (hereinafter '549) and No. 2,471,413 (hereinafter '413), allege infringement of both of said patents by defendant. The '549 patent, issued on November 2, 1948 on an application filed June 24, 1939, discloses a double pulse generator for producing pairs of voltage pulses to be used to test electronic equipment. Claim 13 of that patent, which is the only claim of that patent involved in this proceeding, provides:

In combination, an electron discharge device pulse producing trigger circuit having a stable state and an active state, a connection for supplying a unidirectional current tripping pulse of a predetermined polarity and magnitude to said trigger circuit for changing it from its stable to its active state, an electron discharge device normally biased to cut off, a differentiator circuit *coupled* between the negative output pulse electrode of said trigger and the input of said discharge device, said differentiator circuit serving to produce a sharp positive pulse from the negative output pulse of said trigger circuit of such magnitude as to overcome the cut off bias on said discharge device and render it momentarily conductive, whereby only the trailing edge of said negative output pulse is effective to produce said sharp positive pulse in said differentiator circuit, and a utilization circuit *coupled* to an electrode of said discharge device and responsive to a pulse obtained therefrom. [Emphasis supplied.]

The '413 patent, issued on May 31, 1949 on an application filed May 15, 1940, discloses a pulse code signalling system designed to be used in substitution for the usual Morse code system which employs dots and dashes. In place of a dot, the '413 transmission system employs a single pulse, and in place of a dash, a double pulse is used. At the receiver of the system the single and double pulses are converted into dots and dashes of the Morse code system.[1] Once again, by

---

1. Advantages of this system of substitution of single and double pulses for the Morse code system are said to be the allowance of a great increase in the peak power of the transmitter of the system, so that the receiver sensitivity may be reduced; the provision of a signalling system having an output of constant ampli-

chance, claim 13 is the only claim in the '413 patent which is in issue in this case. That claim states:

In combination, a first electron discharge device trigger circuit having only one degree of electrical stability, said trigger circuit comprising a pair of electrode structures which are interconnected so that one structure is conductive and the other non-conductive in the stable state, and vice versa in the active state, a connection for supplying an input pulse to said circuit for changing it from the stable to the active or unstable state, said circuit having an adjustable element for controlling the time of the active state, a second similar electron discharge device trigger circuit, means including a reactance and a resistor *coupling* said two trigger circuits together, and an adjustable element in said second trigger circuit for controlling the time of the active state of said second circuit. [Emphasis supplied.]

The defendant, a California corporation, is alleged to have manufactured and sold eight devices infringing claim 13 of the '549 patent and fourteen devices infringing claim 13 of the '413 patent.

During the trial, three witnesses, Dr. Cleeton himself [2] and Drs. Terry B. Hockenberry [3] and Ernest H. Krause,[4] testified as experts for plaintiffs.[5] Defendant relied solely on the testimony of Mr. Donald G. Fink.[6] They were the only four witnesses.

Defendant, in addition to denying any infringement, contends that both patents are invalid under section 102 (anticipation), section 103 (obviousness), and section 112 (indefiniteness). Defendant has cited a number of references in support of its position that each of the Cleeton patents is invalid. Those references are considered seriatum herein, followed by a discussion of infringement.

## I. THE CLEETON '413 PATENT

### A. THE REEVES PATENT

Before determining whether the '413 patent is anticipated by or obvious in the light of the disclosures of the Reeves patent, U.S.Patent No. 2,272,070 (hereinafter, the Reeves '070), a threshold ques-

---

tude; and the provision of a certain degree of secrecy because of the requirement that the receiver include a special translation apparatus to decode the single pulse, double pulse signalling elements of the system into the normal dot and dash Morse code.

2. Dr. Cleeton, who is retired, was formerly the Associate Director of Research for Electronics at the Naval Research Laboratory. In the late 1930's he was employed full time at the Naval Research Laboratory in Washington, D. C. and worked on pulse electronic systems for communication, identification and radio control. During World War II, he was the civilian head of a combined U.S. Army-U.S. Navy-Canadian-British research group. For his work in that regard, he received the President's Certificate of Merit and the Meritorious Award from the Naval Research Laboratory. Upon his retirement in 1969, he received from the Department of the Navy the Distinguished Civilian Service Award.

3. Dr. Hockenberry is a 31-year old electrical engineer who since 1964 has been Assistant Professor at Carnegie-Mellon University.

4. Dr. Krause, born in 1913, and the holder of a doctorate in physics, is the sole or joint holder of five letters patents including several involving pulse techniques. He is currently employed as Vice-President of Aerospace Corp. after an earlier career in Government and in industry. Both Drs. Hockenberry and Krause are the authors of articles in the field embodying the subject matter of the within controversy and in related fields.

5. Plaintiffs also relied heavily upon the deposition testimony of Richard E. Colwell, the holder of a B.S. in Engineering Physics, who worked at the Naval Research Laboratory in 1938–1941 and since World War II has been involved in industry in connection with engineering and electrical equipment.

6. Mr. Fink is the holder of A.B. and M.A. degrees in science, the author and editor of numerous publications, the recipient of several important awards including the Medal of Freedom, a fellow of several institutes of electrical, electronic and radio engineers, the holder of two patents, and, since 1967, the general manager of Electrical and Electronics Engineers.

tion of whether or not Reeves is available to the defendants as a prior art reference in establishing the defenses of anticipation and/or obviousness must first be resolved.

■ The application for the patent which was later issued as the Reeves '070 was first filed on November 22, 1939. Dr. Cleeton did not file an application for the '413 until May 15, 1940. Thus, in terms of application filing dates, the Reeves '070 predates the Cleeton '413 and is prima facie a valid prior art reference.

■■ Dr. Cleeton, however, attempts to remove the Reeves '070 as a reference by claiming an invention date for the '413 prior to November 22, 1939, the date of filing of the Reeves '070. In that regard, Dr. Cleeton bears an exceedingly heavy burden of proof, perhaps best expressed by Judge Learned Hand in United Shoe Machine Corp. v. Brooklyn Wood Heel Corp., 77 F.2d 263, 264 (2d Cir. 1935):

> When an inventor's date is to be carried back beyond his application, courts regard the effort with great jealousy, and must be persuaded with a certainty which is seldom demanded elsewhere; quite as absolute as in a criminal case, in practice perhaps even more so. Brooks v. Sacks, 81 F. 403 (C.C.A. 1); Dey Time Register Co. v. W. H. Bundy Recording Co., 178 F. 812 (C.C.A. 2); Bearings Co. v. Harris

Hardware & Mfg. Co., 299 F. 782 (C.C.A. 2). It makes no difference how the question arises; whether the patentee is carrying back his own invention, or a supposed infringer is carrying back his; the burden is the same as the proof necessary to establish a prior use. * * *[7]

■■ In order to establish priority of invention over the Reeves '070 application, Dr. Cleeton must prove that he *both* conceived *and* reduced to practice the invention claimed in the '413 patent before the critical date of November 22, 1939. Ritter v. Rohm and Haas Co., 271 F.Supp. 313, 319–323 (S.D.N.Y.1967). Cf. Gaiser v. Linder, 253 F.2d 433, 435, 45 C.C.P.A. 846 (1958). In Townsend v. Smith, 36 F.2d 292, 295, 17 C.C.P.A. 647 (1929), the Court of Customs and Patent Appeals wrote:

> The conception of the invention consists in the complete performance of the mental part of the inventive act. All that remains to be accomplished in order to perfect the act or instrument belongs to the department of construction, not invention. It is therefore the formation in the mind of the inventor of a definite and permanent idea of the complete and operative invention as it is thereafter to be applied in practice that constitutes an available conception within the meaning of the patent law. A priority of conception is established when the invention

---

7. *See also* Thompson v. American Tobacco Co., 174 F.2d 773, 777 (4th Cir. 1949), in which Judge Soper stated:
[I]n suits for patent infringement . . . one who seeks to carry the date of his invention back of the date of anticipating patents must assume the burden of proof and establish his claim by clear and unequivocal evidence. American Lecithin Co. v. Warfield Co., 7 Cir., 128 F.2d 522.
*And see* Ritter v. Rohm & Haas Co., 271 F.Supp. 313, 319 (S.D.N.Y.1967); Horine v. Ethicon, 142 F.Supp. 282, 288 (D.Md.1956). In the latter case, then Chief Judge Thomsen of this Court wrote:
Plaintiff's evidence on this point must meet a very severe test. "Where one

seeks to carry the date of invention back of the date of an anticipating patent, he assumes the burden of proof, and must establish an earlier date, 'by evidence so cogent as to leave no reasonable doubt in the mind of the court, that the transaction occurred substantially as stated.' Deering v. [Winona] Harvester Works, 155 U.S. 286–301, 15 S.Ct. 118, 39 L.Ed. 153; Columbus Chain Co. v. Standard Chain Co., 6 Cir., 148 F. 622, 78 C.C.A. 394; Barbed Wire Patent, 143 U.S. 275, 12 S.Ct. 443, 450, 36 L.Ed. 154; Coffin v. Ogden, 18 Wall. 120–124, 21 L.Ed. 821." Moline Plow Co. v. Rock Island Plow Co., 7 Cir., 212 F. 727, 732.

is made sufficiently plain to enable those skilled in the art to understand it.

Dr. Cleeton's own testimony,[8] his Naval Research Laboratory notebooks [9] and the deposition testimony of Mr. Colwell,[10] who worked as an assistant to Dr. Cleeton, appear to support the latter's contention that in late January, 1939, Dr. Cleeton had "a definite and permanent idea of the invention expressed in his claim[s]." Ritter v. Rohm and Haas Co., *supra*, 271 F.Supp. at 323. There is some suggestion in Colwell's testimony that another assistant of Dr. Cleeton, Mr. Hilferty,[11] suggested the use of the variable resistors which made the transmitter and the receiver work.[12] Nevertheless, defendant does not seem to dispute that Dr. Cleeton conceived the claimed invention prior to November 22, 1939. Defendants do, however, contest Dr. Cleeton's contention that the invention claimed in the '413 patent was reduced to actual practice before that date, i. e., the filing date of the Reeves '070. "The essential inquiry" in determining reduction to practice "is whether the advance in the art represented by the invention . . . was embodied in a workable device that demonstrated that it could do what it was claimed to be capable of doing." Farrand Optical Co. v. United States, 325 F.2d 328, 333 (2d Cir. 1963). The question arises as to whether the circuits claimed in the '413 patent were utilized in a pulse communications system that was tested under actual operating conditions prior to the critical date.

Dr. Cleeton's contention that the circuits claimed in the '413 were embodied in a workable device again rests upon his own testimony,[13] his logbooks,[14] and Colwell's deposition testimony. Dr. Cleeton testified that on February 3, 1969 he successfully conducted in the laboratory a bench test of pulse communications equipment utilizing the '413 circuits.[15] Colwell testified that in late January, 1939, Dr. Cleeton disclosed to him and to Hilferty two circuit diagrams, one a "means of encoding normal Morse code into pulses [in] which a dot would be represented by a single pulse and a dash by a double pulse" (Plaintiffs' Ex. 52 at 10) and another a means "for receiving single pulses and double pulses and converting them back to dots and dashes corresponding to the International Morse Code" (Plaintiffs' Ex. 52 at 19); and that he (Colwell) then proceeded to construct the circuits. After a series of errors which Colwell stated were the result of his own inexperience, and after several suggestions and changes had been made by Hilferty, Colwell testified that he and Hilferty conducted, on February 2, 1939,[16] a laboratory bench test, using transmitting and receiving units connected to each other by a single piece of wire. Colwell further stated that the bench test "proved that the coding and decoding

---

8. Dr. Cleeton (T. Tr. 2123) read the following description of his claimed invention from his notebook:

"A new system of pulse communication occurred to me in which there is some degree of secrecy and a large saving of power. The principle of the system is to transform the dots and dashes into pulses which are transmitted on the carrier and then transformed back to dots and dashes at the receiver. Two ways of doing this occurs to me. One, using two pulses to represent a dash and one pulse to represent a dot; two, using two pulses in each case, but let the spacing determine the dot or the dash."

9. Plaintiffs' Ex. 44A at 51.

10. Plaintiffs' Ex. 52 at 10, 19–21.

11. Deceased before trial.

12. See the discussion *infra* at p. 1224.

13. T. Tr. 2110–2269.

14. Plaintiffs' Ex. 44A, from which certain entries were read. *See* T. Tr. 2110–2269.

15. T. Tr. 2128, 2153.

16. Colwell's notebook was not introduced into evidence at trial. It was used by Colwell when he gave his deposition and Colwell then stated that his notebook showed a test on February 2, 1939. Colwell said nothing about a test on February 3, 1939. It is possible that there was only one test rather than two tests on successive days.

was possible, could be accomplished . . . " (Plaintiffs' Ex. 52 at 57).

Courts faced with the issue of whether laboratory or bench tests, in the absence of field tests, establish a reduction to practice have relied on a number of different factors including the complexity of the device, the nature of the tests, and the conditions to which the device would be subjected when put into practical use. *See* Elmore v. Schmitt, 278 F.2d 510, 512–513, 47 C.C.P.A. 960 (1960), in which the inventor had satisfactorily bench tested, using an oscilloscope to measure critical wave forms, a binary counter which he intended to be used in computers, radar equipment, Geiger counters and television circuits. While recognizing that the tests "probably afford a better indication of the properties of the device tested than would be given by normal use in a practical apparatus (at 512), the Court wrote that the inventor "must show that his invention worked as intended to work in its practical contemplated use" (at 512–513) and held that the tests were not sufficient to establish reduction to practice because those tests did not duplicate either

> the conditions which would normally be encountered in a practical application of the invention in issue with respect to the resistance and character of load, nature of pulses, including

voltage, duration and amplitude, and amount of capacitance used. Neither is it shown that the tests accurately reproduced the conditions of temperature, vibration, or sustained operation which would usually be encountered in a specific use. [at 512][17]

Both Dr. Cleeton [18] and Mr. Colwell [19] testified that the circuits were intended to be used in sophisticated communications equipment for transmitting and receiving Morse code. But their testimony reveals that the circuits were not installed in such equipment and that the equipment used was not tested under actual operating conditions.[20] Moreover, it is apparent that all of the persons who witnessed the two February, 1939 tests were aware that although what Dr. Cleeton had conceived and achieved at that time was no doubt important, much work needed to be done to develop the system. Dr. Cleeton himself testified that one of the witnesses to the February 3rd test, Commander Swenson "expressed an opinion that it should be worked out as soon as possible for Navy use." [21] Dr. Cleeton also testified on cross-examination that there were problems encountered in actual radio communications, which were not present when the transmitter and receiver were connected by a piece of wire.[22] Such problems included propagation length,[23] echo suppression,[24] static and fading,[25]

---

17. *See also* Gaiser v. Linder, 253 F.2d 433, 45 C.C.P.A. 846 (1958), in which the Court held that there was no reduction to practice where laboratory tests of an airplane windshield, designed to conduct electricity and thus prevent icing, did not duplicate flight conditions; and Radio Corp. of America v. International Standard Electric Corp., 232 F.2d 726, 731 (3d Cir. 1956), in which the Court declined to find there was a reduction to practice where the only tests of a radar device, intended for use on ship and airplanes, were conducted from the top of an office building. *Cf.* Farrand Optical v. United States, 325 F.2d 328, 333–334 (2d Cir. 1963), in which an airplane gun and bomb sight was held reduced to practice even though there was no testing in an airplane. However, in that case, the inventor's purpose was to allow the view-

er to see outside the structure he occupied, a result which could be tested from structures other than airplanes.

18. T.Tr. 2176–77, 2192.

19. Plaintiffs' Ex. 52 at 78.

20. Colwell's testimony indicates that, at the time of the bench test, Dr. Cleeton, Hilferty and himself were primarily concerned about radio communications. It would appear at least questionable whether the connection of the two units by a short piece of wire can duplicate actual operating conditions.

21. T. Tr. 2128 and 2166.

22. T. Tr. 2208.

23. T. Tr. 2192.

24. T. Tr. 2195–96, 2211.

25. T. Tr. 2206.

and reflections.[26] Colwell testified that while "[t]he bench test of the equipment, of course, proved that the coding and decoding was possible, could be accomplished[27] . . . the Navy would not be satisfied with that as a piece of working equipment, so we were required to field test the equipment."[28] Colwell testified concerning a field test during which Colwell operated the voice communications equipment to maintain contact with the other station and Hilferty operated the equipment being tested. There is no evidence of what Hilferty observed. Colwell stated that because no one at the other station could read code, "as far as transmission between the two points in code, it [the field test] meant nothing."[29] The transmission of Morse code by pulse communications was the primary purpose of the circuits being tested.

Accordingly, particularly in light of the heavy burden that plaintiffs must bear, this Court holds that the laboratory and field tests in the winter and spring months during the year 1939 do not establish reduction to practice for the circuits claimed in the Cleeton '413 patent.

■■ Dr. Cleeton testified at trial that a pulse communications system was field tested on September 25, October 10, October 13, and October 17, 1939,[30] and offered in support of that testimony his notebook entries reporting the nature and results of those four field tests. "[W]e must apply the established rule that an inventor's own testimony with respect to his invention and reduction to practice constitutes a selfserving declaration and cannot be given probative force even if it is uncontradicted and convincing unless it is supported by adequate corroboration." Tidewater Patent Development Co. v. Gillette, 273 F.2d 936, 940 (4th Cir. 1960) (Soper, J.). To

the same effect, *see* Thompson v. American Tobacco Company, 174 F.2d 773, 776–777 (4th Cir. 1949); Ritter v. Rohm & Haas Company, *supra*, 271 F. Supp. at 320; Jackson v. Dunham-Bush, Inc., 220 F.Supp. 377, 383 (D.Md.1963) (Winter, J.). An inventor's notebooks and other documents prepared by him or under his supervision do not constitute such necessary independent corroboration; rather they are self-serving. Thurston v. Wulff, 164 F.2d 612, 617, 35 C.C.P.A. 794 (1942); American Machine and Foundry Co. v. Liggett & Myers Tobacco Co., 172 F.Supp. 12, 16 (D. N.J.) aff'd, 272 F.2d 451 (3d Cir. 1959); Bennett and Woolley v. Franklin, 169 U.S.P.Q. 791, 793 (C.C.P.A.1970). *See also* Gortatowsky v. Anwar and Colderon, 170 U.S.P.Q. 41, 43 (C.C.P.A.1971). However, in other cases courts have held that whether an inventor's notebooks are sufficient to corroborate his own testimony should be governed by a "rule of reason." Anderson and Truett v. Pieper, Rickert and Stein, 169 U.S.P.Q. 788, 790 (C.C.P.A.1971). Adopting that approach, at least one court admitted into evidence as corroborative evidence and along with the inventor's testimony, a notebook to establish a date of conception prior to the effective date of a claimed reference. Ritter v. Rohm and Haas Co., *supra*, 271 F.Supp. at 320. In so holding, Judge MacMahon wrote:

> We are disinclined to rely on quantitative rules of evidence in our search for truth. Their appeal of simplicity is outweighed by the vice of blindness. Rather, we look to the purpose behind the rule requiring corroboration for guidance in its application. The manifest purpose of the rule is to prevent fraud. When the validity of a patent turns on the exact date a certain event occurred, or discovery was made, there is an inherent risk of perjury if after-

---

26. T. Tr. 2210.

27. In bench testing the equipment, Colwell used an oscilloscope a method seemingly identical to that held insufficient to establish reduction to practice of elec-

tronic equipment in Elmore v. Schmitt, *supra*.

28. Plaintiffs' Ex. 52 at 57.

29. Plaintiffs' Ex. 52 at 73.

30. T. Tr. 2155–58.

the-fact oral testimony by the most interested party, the alleged inventor, can carry the invention date back beyond the filing date.

In light of that purpose, it would be absurd to hold that Ritter's notebook is not sufficient corroboration, but that "independent" evidence of his conception date is required. The issue here is the exact date when, in late 1944, almost twenty-three years ago, Ritter conceived his invention. His notebook, a document of uncontested authenticity, is a contemporaneous record of his thoughts and actions. It is hard to imagine what more reliable corroborative evidence could be found. Indeed, we note that it was similar documentary evidence that Judge Learned Hand held sufficient to establish a pre-filing invention date in United Shoe Machinery Corp. v. Brooklyn Wood Heel Corp., 72 [77] F.2d 263 (2 Cir. 1935). To assert that the "independent" recollection of some of Ritter's former students about what transpired during the few crucial weeks in 1944 would be more probative than the immutable notebook files in the face of common experience. Memories are fallible, particularly in trying to recall the precise date of long forgotten events whose importance is only subsequently created by the Byzantine nuances of litigation. To rule out Ritter's notebook on the ground that it is "self serving" is to exalt labels over reason. There is not the slightest hint that the notebook is a fabrication or that any of the entries are not genuine expressions of Ritter's thoughts and deeds on the date entered. Of course, if the notebook is probative, it is "self serving" in the sense that it aids Ritter's cause, but all evidence suffers from such corrupting limitations.

271 F.Supp. at 320–321.[31] Assuming, *arguendo* only, the correctness and the applicability herein, of Judge MacMahon's approach, Dr. Cleeton's Naval Research Laboratory notebooks would constitute independent corroborative evidence of his oral testimony concerning the four field tests in the fall of 1939.[32] However, even if Dr. Cleeton's notebooks are so considered, Dr. Cleeton's own testimony, and his logbook entries themselves, cast substantial doubt on whether the circuits disclosed in the '413 patent were utilized in the September-October, 1939 tests. On cross-examination, the following colloquy took place between Dr. Cleeton and counsel for defendant concerning a system composed of the circuits first tested in February, 1939 and described in the '413 patent:[33]

Q   But you did give up that system?

A   I think, as I recall, at this time and beyond I did not test that system further.

Q   So the answer is yes?

A   I wouldn't say I gave it up; it is usable under proper circumstances, and would have been a valuable system if adopted, in proper circumstances.

Q   But it was never used?

A   Not to my knowledge.

Q   You did further work on the pulse communication problem, which that was intended to be a solution of, didn't you?

A   Yes, I continued work for some time.

31. Ritter appears to be the only case in which the sole corroboration was the inventor's own notebook. *Cf.* Berry v. Webb, 412 F.2d 261, 267 (Cust. & Pat. App. 1969), in which there was additional corroboration in the form of testing by a research assistant.

32. Because this Court so holds, it does not reach an additional argument pressed by the plaintiffs, that Dr. Cleeton's logbooks are admissible under 28 U.S.C. § 1732.

*See* Alpert v. Slatin, 305 F.2d 891, 895, 49 C.C.P.A. 1343 (1962), holding an inventor's work and progress reports to his superiors inadmissible under 28 U.S.C. § 1732. *See also* Teter v. Kearby, 169 F.2d 808, 816–817, 36 C.C.P.A. 706 (1948) ; *but cf.* C. S. Johnson Co. v. Stromberg, 242 F.2d 793, 798–799 (9th Cir. 1957).

33. T. Tr. 2212–15.

Q *You worked on other techniques, techniques other than the ones shown in the —413 patent.*

A *Correct.*

Q I refer you next, please, to page 26 of the same exhibit, under date of 29 August '39. I note the entry:

"*First test* with pulse communicator between Field House and Laboratory (Building 12). A standard Navy transmitter was pulse modulated with a pulse at the beginning and end of each character."

*That is not the system of the –413 patent, is it?*

A *No.*

Q It is the system of one of these other patents, it is not? And particularly of—

A Defendant's Exhibit 35.

Q Correct. I mean, that is my indication, too.

*Do I conclude correctly from this entry that the system of the —413 patent was not tested outside of the laboratory?*

A *It is my present recollection that it was not tested in the field.*

Q *In the tests that are referred to here, was the receiver of the type that was shown in the –413 patent?*

A What do you mean by "here"?

Q I have reference to the entry I just read from page 26, under date of 29 August 1939.

THE WITNESS: May I have the question re-read?

(Question read.)

A *No.*

Q And the keyer was also different?

A Right.

Q Refer next, please, to page 27. *I note the entry under date of 4 Sep-*

*tember '39:* "Worked on electronic keyer last week. Friday had it in rough shape. Building it to deliver either a double pulse at beginning and single pulse at end, or single pulse at beginning and end."

*Now, that system is not the system of the –413 patent in suit, is it?*

A *No, that incorporates both of the other systems.*

Q Does that have any relationship to the patent number 2,591,677, which is shown in Defendant's Exhibit 37?

A Yes, it does.

[Emphasis supplied.][34]

If, of course, the circuitry actually tested in September and October of 1939 was not that later claimed in the '413 patent but was in fact circuitry later claimed by Dr. Cleeton, those tests, no matter how successful, have no bearing on the question of whether the '413 claims were reduced to practice before the Reeves filing date in November, 1939.

Further, even if it is assumed that the equipment tested in September and October, 1939 did in fact utilize the '413 circuit nevertheless, Dr. Cleeton's logbook entries indicate that while those tests were partly successful, continual difficulties were encountered. For example, distance was a problem during the October 10, 1939 test;[35] the transmitter broke down during the third test on October 13;[36] on October 17, pulses could not be picked up using a horizontal antenna;[37] the logbook entry dated October 23, 1969 reports that "the receiver was being keyed on the first pulse instead of the second, which caused short signals on single noise pulses";[38] and, during the fourth and final test, the receiver circuits had to be changed.[39] After that date, no further tests were conducted and, according to Dr. Cleeton's own testimony, the pulse communica-

34. The record discloses that Dr. Cleeton's notebooks were available to him during such cross-examination and that he referred to them and to the circuit diagrams which appear therein.

35. T. Tr. 2156.

36. T. Tr. 2157.

37. T. Tr. 2158.

38. T. Tr. 2158.

39. T. Tr. 2158.

tions system was never put into use by the Navy.[40]

■ Evaluating all of the evidence presented by Dr. Cleeton in terms of the heavy burden of proof imposed by the law upon the inventor who seeks, as Dr. Cleeton does here, to place his date of invention before the date on which he filed application for a patent, this Court finds that evidence neither "clear and unequivocal," Thompson v. American Tobacco Company, *supra,* 174 F.2d at 777, nor "so cogent as to leave no reasonable doubt in the mind of the court . . .," Horine v. Ethicon, 142 F. Supp. 282, 288 (D.Md.1956), quoting from Deering v. Winona Harvester Works, 155 U.S. 286, 301, 15 S.Ct. 118, 39 L.Ed. 153 (1894). Accordingly, this Court holds that the circuits claimed in the '413 were not reduced to practice before the filing date of the Reeves '070, and that, therefore, the Reeves '070 is fully available to defendants as a prior art reference in establishing the defenses of anticipation and obviousness.[41]

Both parties in this case agree that the Reeves '070 discloses all the elements of claim 13 of the Cleeton '413 patent except that the latter provides for adjustable resistors for controlling the duration of the active states of the two monostable trigger circuits, and the Reeves '070 discloses two monostable trigger circuits, the duration of the active state of which is constant because resistors with constant values are used.[42] The Reeves patent teaches that the time span during which the two monostable trigger circuits are in the active state is determined by the value of "resistance-rectifier-condenser circuit." [43] In the '070, that value is constant. Additionally, Reeves does not teach the use of elements which are variable or adjustable, or that the time of the active state of the two monostable

trigger circuits can be made adjustable. The question posed, therefore, is whether Dr. Cleeton's use of adjustable resistors was a significant enough advance in the art in 1939 to be awarded the status of an invention under the patent law, in the light of Reeves' earlier disclosure of circuits identical to Dr. Cleeton's '413 circuits, except that Reeves used fixed or constant value instead of variable resistors.

In Marconi Wireless Telegraph Company of America v. United States, 320 U.S. 1, 63 S.Ct. 1393, 87 L.Ed. 1731 (1943), the Supreme Court considered the validity of a patent by Guglielmo Marconi claiming the invention of "a structure and arrangement of four high frequency circuits [two for the radio transmitter antenna and two for the radio receiver antenna] *with means of independently adjusting each* so that all four may be brought into electrical resonance with one another." 320 U.S. at 10, 63 S.Ct. at 1398 (emphasis added). After a thorough examination of the prior art dealing with the principles of adjusting or tuning antenna circuits and the mechanisms that had been employed for achieving such adjustability, the Supreme Court held that Marconi's claim was anticipated by the prior art and thus was not an invention. Mr. Chief Justice Stone wrote (at 31–32, 63 S.Ct. at 1407–1408):

No invention was involved in employing the Lodge variable inductance for tuning either the closed or the open circuits in lieu of other structural modes of adjustment for that purpose. The variable inductance imparted no new function to the circuit; and *merely making a known element of a known combination adjustable by a means of adjustment known to the art, when no new or unexpected result is*

---

40. T. Tr. 2228.

41. Even if Dr. Cleeton established an invention date prior to the Reeves filing date, Reeves would be available to defendant as evidence of "simultaneous invention," one of the subtests of obviousness. *See* Reeves Brothers, Inc. v. United

States Laminating Corp., 282 F.Supp. 118, 140 (E.D.N.Y.1968), aff'd, 417 F.2d 869 (2d Cir. 1969).

42. Defendant's Brief 64; Plaintiffs' Reply Brief 56; Final Argument Tr. 302.

43. Reeves specification at p. 6, line 10.

*obtained is not invention.* [Emphasis supplied.]

■ As above stated, the Reeves patent itself does not expressly disclose that any elements including resistors can be made adjustable to vary the duration of the active states of the monostable trigger circuits. The Cleeton '413, on the other hand, does employ variable resistors. However, defendant's expert witness, Mr. Fink, testified that the Reeves '070 could in fact be practiced by using adjustable resistors in place of its fixed value resistors to vary the duration of the trigger circuits' active states and that Reeves could be said fairly to disclose or teach the use of variable resistors. Thus, the Reeves '070 does not exhibit such a "substantial representation of the invention [later claimed by Cleeton '413] in such full, clear and exact terms that one skilled in the art may make, construct and practice the invention [i. e., the Cleeton '413] without having to depend on either the patent or on his own inventive skills." Cummings Engine Company v. General Motors Corp., 299 F.Supp. 59, 91 (D.Md.1969), aff'd 424 F.2d 1368 (4th Cir. 1970), and cases cited thereat. Accordingly, this Court does not conclude that Reeves '070, standing by itself, anticipated Cleeton '413 under 35 U.S.C. § 102, though if Reeves and the Koch patent, discussed *infra,* are considered together, they would appear to constitute such an anticipation. In *Marconi,* Mr. Chief Justice Stone seems to have relied on the totality of the disclosures in more than one patent, in the context of an anticipation holding. Still, section 102, dealing with anticipation, would seem to require reference to one prior disclosure at a time. To the contrary, section 103, dealing with obviousness, permits reliance upon such a totality. *Cf.* University of Illinois Foundation v. Winegard Company, 402 F.2d 125, 128 (8th Cir. 1968), cert. denied, 394 U.S. 917, 89 S.Ct. 1191, 22 L.Ed.2d 452 (1969).

The use of variable resistors was well known to the art in 1939. For example, the Koch patent, No. 2,050,059 [DX3–A] discloses the use of variable resistors to control the duration of the unstable state of multivibrators.

■ One skilled in the art in 1939, knowing of Koch, *inter alia,* surely understood how to replace Reeves' fixed value resistors with variable resistors of the type used in the Cleeton '413.[44] This Court is unable to discern any "new or unexpected result," *Marconi, supra* 320 U.S. at 32, 63 S.Ct. 1393, or any "synergistic result,"[45] Anderson's-Black Rock v. Pavement Salvage Co., 396 U.S. 57, 61, 90 S.Ct. 305, 24 L.Ed.2d 258 (1969), in Dr. Cleeton's use of variable resistors. Of course, one result of their use was to achieve adjustability of the unstable state of the monostable trigger circuits. But that result, particularly in light of the disclosure of the Koch patent, is not an invention. In sum, this Court holds the Cleeton '413 patent invalid because of obviousness in the light of Reeves and Koch taken together.

### B. THE GERMAN ARTICLES

A further prior art reference cited by defendant in support of its contentions with regard to anticipation and obviousness is a pair of articles published in a German scientific journal in 1932.[46]

44. Colwell testified that it was Hilferty, the research assistant, who first used, apparently on his own, variable resistors in connection of the '413 circuits. Plaintiffs' Ex. 52 at 73.

45. Synergism is "the combined action of two or more agents (as drugs) that is greater than the sum of the action of one of the agents used alone." Webster's Third New International Dictionary (1967).

46. Knoll and M. Freundlich: "A Kipp Relay with Very Short Switching Time," Elektrotechnische Zeitschrift, July 14, 1932 (Defendant's Ex. 1–W), hereinafter referred to as the German I publication; and H. Baatz, M. Freundlich and W. Holtzer, "Delay Network in the Case of Recordings with a Cathode Ray Oscillograph," Elektrotechnische Zeitschrift, July 21, 1932 (Defendant's Ex. 1–X), hereinafter referred to as the German II publication.

The parties agree [47] that the second of those two articles (the German II) discloses two monostable multivibrators connected together by a delay circuit. That interconnecting circuit serves to introduce a controllable intentional time delay between the action of the first monostable multivibrator (a trigger circuit) and the second monostable multivibrator (also a trigger circuit). The two monostable multivibrators each have a resistor which determines the duration of the unstable or active state of that trigger circuit.

Like the circuits described in German II, claim 13 of the Cleeton '413 claims two monostable trigger circuits connected to each other. The interconnection between the two monostable trigger circuits is described in claim 13 as a "means including a reactance and a resistor *coupling* said two trigger circuits together." (Emphasis added.) And it is over the meaning of that word "coupling" which, as aforesaid, appears in the Cleeton '413 patent, and also of the word "coupled" which is used in claim 13 of the Cleeton '549 patent, as those words "coupling" and "coupled" were understood and used by persons skilled in the art of electronics in and about 1940, that a controversy which pervades this case arises.[48]

The defendant contends that "coupling" is both a generic, and a definite, term which was used in the art to describe any interconnecting network between two circuits, as long as the current and voltage in one circuits influences or affects the current and voltage in the second circuit, regardless of whether that interconnecting network introduces a time delay between the operation of the first and second circuits or whether that network is constructed so that the two circuits operate virtually simultaneously or, in other words, in coincidence with one another (as do the two monostable trigger circuits that are disclosed in the *specification* and drawings of the '413 patent). Because "coupling" is a word which is used in the description of circuits which operate both with intentional delay and in coincidence, defendant argues that the two monostable multivibrators, connected together by an interconnecting delay network, as disclosed in German II, are "coupled" together as that term was understood in the art in and about 1940, even though that article does not use the word "coupled" to describe the delay circuit. Defendant contends that if the two monostable trigger circuits in the German II are "coupled," then, by claiming a "means including a reactance and a resistor coupling said two trigger circuits together" in claim 13 of the '413 patent, Dr. Cleeton claimed what had already been disclosed in the German II article. Therefore, defendant urges that the German II anticipates the '413 patent.[49]

Dr. Cleeton, on the other hand, contends that the term "coupling" does not have a generic meaning, but that when

---

**47.** Defendant's Proposed Findings of Fact No. 31 at 15–16; Defendant's Brief 86; Plaintiffs' Proposed Findings of Fact Nos. 145–47 at 33; Plaintiffs' Reply Brief 61.

**48.** The meaning of the word "coupling" in the '413 patent and the word "coupled" in the '549 patent are also important with respect to whether the Cleeton patents are invalid because of the indefiniteness of the claims. That issue is discussed beginning at p. 1235 *infra.*

**49.** The defendant's theory is well summarized by Judge Winter in Wayne Knitting Mills v. Russell Hosiery, 4 Cir., 400 F.2d 964, 968 (1968):

> [t]he claim, in our view, is invalid, because it is so broad that it claims as invention that which plaintiffs concede was not new. Stated otherwise, by the breadth of the claim that which is conceded to have been known in the prior art—that which the prior art anticipated or made obvious—is included within the claimed invention; hence, the claim is invalid for overclaiming. Schriber-Schroth Co. v. Cleveland Trust Co., 305 U.S. 47, 59 S.Ct. 8, 83 L.Ed. 34 (1938).
>
> *See also* 1 A. Deller's, Walker on Patents § 57 at 241–44 (2d ed. 1964), and cases cited therein.

used alone, without qualifying or modifying words, as it is used in claim 13 of the '413 patent, it can *only* mean a network between two circuits which causes the two circuits to operate in coincidence.[50] Therefore, he would have this Court conclude that claim 13 of the '413 patent claims only two monostable trigger circuits operating in coincidence and covers nothing disclosed by the German II publication. As an alternative argument, Dr. Cleeton takes the position that the word "coupling" does not always indicate coincident and delay networks, but that that word is susceptible to either meaning, and that to determine which meaning is indicated by the use of the word, it is not only perfectly proper but necessary to look to the specifications and drawings of the patent and thus to determine the scope of the claim of the patent. In the case of the Cleeton '413, that secondary argument would lead to the conclusion that the specifications and the drawings disclose a coincident network between the two monostable trigger circuits; that claim 13 does not duplicate the disclosures of the German II; and that that article does not therefore anticipate the '413.

In support of their respective positions, the parties have offered a mass of conflicting expert testimony, documentary evidence, and argument concerning the meaning of the word "coupling." The sharp differences of opinion between Dr. Cleeton and Dr. Hockenberry on the one hand, and defendant's expert, Mr. Fink, on the other, all of whom this Court believes testified in the best of faith, would alone tend to lead this Court to the conclusion that the meaning of the word "coupling" is indeed uncertain and that men skilled in the art in and about 1940 would have, upon having seen that word in a patent or publication, looked to the total context in which it was used in order to determine whether a coincident or delay network was intended. Furthermore, this Court's examination of the numerous patents and articles containing the words "coupling" or "coupled," introduced into evidence by the parties in support of their respective positions, reinforces that conclusion.

The parties agree that in none of the numerous references—the dictionary definitions,[51] scientific articles, and patents—is it stated that the term "coupling" includes only coincident networks and excludes delay networks or, vice versa, that the term includes only delay networks and excludes coincident networks.[52] Furthermore, the parties have stipulated[53] that in each of the Rust, Lewis, Eaton, Hollingsworth and Bess patents, all introduced by defendant in support of its position, the term "coupling" is used in the same patent to describe some circuits which introduce intentional delay, and other circuits which permit coincident operation, and that in each instance where the word is used, one can only determine which of the two possible meanings was intended by the patentee by examining the context in which the term was used, that is, by looking to the disclosure in the specifica-

---

50. Plaintiffs' Brief 38; Reply Brief 42.

51. The dictionary and article definitions suggest that the word "coupling" has a broad meaning. Webster's New International Dictionary of the English Language 40 (2d ed. 1934) (Plaintiffs' Ex. 75), states:

Coupling . . . 4 Elec. *means of electric connection of two electric circuits* by having a part common to both. The common part is a condenser in capacitive coupling, an inductance coil in direct coupling, the magnetic field of a mutual inductance in *inductive coupling* and a resistor in resistive or conductive coupling. [Emphasis added.]

The Wireless Engineer 485 (September, 1932) (Defendant's Ex. 1–Y) states:
Is it possible to give a simple, succinct definition—or, indeed, any definition—of the coupling between two circuits? * * * To be satisfactory, the definition should be *quite general and apply to the interaction between any two circuits, however constituted and however coupled.* It is only when one tries to draw up such a definition that one realizes how vague and elusive the underlying conception really is. [Emphasis added.]

52. Final Argument Tr. 83–84, 104.

53. T.Tr. 1224–27.

tions and drawings of the patent. It is true, as plaintiffs point out, that in most instances in which the term "coupling" is used alone, without modifying words, the disclosures of the specifications and drawings of the patent indicate a coincident coupling, while when a delay coupling is intended, modifying or descriptive words are used to indicate delay.[54] There are, however, exceptions to that general rule [55] in which the term "coupling" is used without delay language to describe what is in fact a delay circuit.

This Court concludes that the term "coupling" as it was understood in the art in and about 1940 when Dr. Cleeton applied for the '413 patent did not have both a generic and a definite meaning, encompassing in all instances, as defendant contends, both coincident and delay circuits. Nor did that term, even when used alone, describe only coincident circuits. Rather, the word "coupling," standing alone, was ambiguous. The art used the term to describe either coincident and delay networks and depended upon the context of its use to make clear which meaning was intended.

The claims of a patent should always be interpreted in the light of the specifications. Schriber-Schroth v. Cleve-land Trust Co., 311 U.S. 211, 217, 61 S. Ct. 235, 85 L.Ed. 132 (1940). *See* Morpul, Inc. v. Glen, Raven Knitting Mill, Inc., 357 F.2d 732, 734 (4th Cir. 1966). Defendant does not dispute that the Cleeton '413 in fact disclosed in and about 1940 to the man of ordinary skill in the art a coupling circuit which produces coincident operation of the two monostable trigger circuits.[56] On the other hand, the German II publication discloses a delay coupling circuit which is to be contrasted with the coincident coupling circuit in the '413. Given that obvious difference between the prior art reference and the patent which defendant herein claims to be invalid, the German II publication does not provide a "substantial representation of the invention [claimed in the Cleeton '413] in such full, clear, and exact terms that one skilled in the art may make, construct and practice the invention without having to depend on either the patent [the Cleeton '413] or his own inventive skills." Cummings Engine Company v. General Motors Corp. *supra*, 299 F.Supp. at 91. Accordingly, this Court holds that the German II publication does not anticipate the Cleeton '413 patent.

However, it would appear to this Court that one skilled in the art in and about

54. For example, the Wilson U. S. Patent 2,221,666 (Defendant's Ex. 1–I) states that: "The control circuit of tube 16 is *coupled* to a common portion of the charging and discharging circuit of condenser 14 *by a delay circuit* . . . ." (emphasis added); the Eaton U. S. Patent 2,401,416 (Defendant's Ex. 1–N) reads: "Also *the delay circuit 29* may be *coupled* through a transformer 37 to the signal transferring circuit . . . ." (emphasis added); and the Bess U. S. Patent 2,543,451 (Defendant's Ex. 1–S) speaks of a "delay line coupling."

55. The Rust U. S. Patent 2,454,076 speaks only of "band pass coupling circuits." Both Mr. Fink (T.Tr. 671) and Dr. Hockenberry (T.Tr. 2005) agreed that the band pass coupling circuit in Rust was a delay circuit.

During final argument, defendant brought to this Court's attention two patents, U. S. Patent Nos. 3,549,851 and 3,585,340, recently issued to Dr. Hockenberry. These patents refer to a "pulse prolonging circuit," employed to delay the tuning of a switch, as being "coupled between said keying circuit and said switching means. Thus, these two patents appear to use "coupling" in a delay context.

56. Defendant argues that while the drawings and specifications of the '413 patent describe a circuit that clearly does not employ delay between the two trigger circuits, nothing in that patent teaches one skilled in the art *not to use* a delay coupling circuit between the two trigger circuits. Therefore, defendant urges, the Cleeton '413 claims a delay coupling by virtue of the inference to be drawn from Cleeton's failure to expressly exclude delay. However, defendant does not cite, nor has this Court found, any authority to support this method of claim construction for purposes of overclaiming, anticipation or obviousness. This same argument is discussed with respect to indefiniteness under 35 U.S.C. § 112, at p. 1235 *infra*.

1940 would have found it obvious that, by removing the delay elements from the network coupling together the two trigger circuits in the German II, one could have achieved the result claimed in claim 13 of the Cleeton '413 patent. With regard to that claim, if the result of removing the delay element from what was disclosed in German II was only to achieve coincident operation, then that is hardly a new result. Indeed, the German publication would appear itself to suggest that such removal can be accomplished. The introductory paragraph of that article states that:

> The processes in the time and the measuring circuit must take place *simultaneously;* therefore two circuits must be electrically coupled with one another in the case of rapid processes. In many cases a rigid coupling of the two circuits will no longer suffice for an intensive investigation. In that case, one must switch an intermediate circuit with the arbitrary adjustable retardation time between the circuits. [Emphasis added.] [57]

Plaintiffs also contend that the Cleeton '413 patent is not anticipated by or obvious in the light of the two German publications because neither of those two articles disclose that the adjustable resistors, $R_{rk}$ and $R_{rk}'$ in the German II publication, which determine the duration of the unstable or active state of the two monostable trigger circuits, can be made adjustable or variable, so as to vary the duration of the active state as required by claim 13 of the '413 patent. It is true that the two German articles do not expressly teach the use of adjustable elements to control the time span of the active state of each of the two trigger circuits. But German I does state: "The time, during which the relay persists is the second position of equilibrium, therefore, the length of the square wave will depend on the time constant $R_{rk}$, $C_2$ and *may be selected* as desired *through a change* of $R_{rk}$." (Emphasis added.) [58] This Court need not decide whether that language, considered alone or in the light of the totality of the two German articles, constitutes anticipation of the '413, because that language, in and of itself, was sufficient to render the use of variable resistors obvious to one skilled in the art in and about 1940. As mentioned *supra* in connection with this Court's discussion of the Reeves '070 patent, the Supreme Court held in Marconi Wireless Telegraph Company of American v. United States, *supra,* 320 U.S. at 31–32, 63 S.Ct. at 1408, that "merely making a known element of a known combination adjustable by a means of adjustment known to the art, when no new or unexpected result is obtained is not invention." That holding compels herein a finding of obviousness, with regard to the '413 patent, in the light of the above-quoted language in the two German references, just as it did in the case of the Reeves patent. The two German articles, in their totality and in the use of that language, suggest and point to the use of variable resistors to control the duration of the active state of the two monostable trigger circuits. Accordingly, this Court holds the Cleeton '413 patent invalid for obviousness in the light of the disclosures of the two German publications. [59]

## II. THE CLEETON '549 PATENT

### A. FRENCH PATENT NO. 837,571

The French '571 patent discloses a series of rectangular or square wave generators connected together by differentiating circuits. If those generators are monostable (as are the trigger circuits required by claim 13 of the Cleeton '549 patent), the French '571 constitutes an anticipation of the '549. The French patent does not expressly indicate wheth-

---

57. Defendant's Ex. 1–X–1.

58. German I publication, at page 8 of the translation. The German II publication cites the above reference to German I in footnotes 2 and 16.

59. The Cleeton '413 patent is also invalid for obviousness because of the disclosures of French Patent No. 837,571. See the discussion at p. 30 et seq., *infra* and in n. 68a, *infra.*

er its generators are monostable or astable. Rather, that patent merely refers to the use of "blocking oscillators," which may be either monostable or astable.[60]

Defendant's expert witness, Mr. Fink, while admitting that the French patent is indeed silent on the question of the monostability or astability of the generators, testified that the patent could only be successfully practiced with monostable generators and that serious difficulties would arise if one attempted to practice the French patent using free running or astable generators.[61]

The testimony of the plaintiffs' witnesses was directly contrary to that of Mr. Fink. Dr. Krause,[62] Dr. Hockenberry [63] and Dr. Cleeton [64] all testified that the French patent itself strongly suggests the use of astable generators and that the patent could only be successfully practiced by using that type of generator.[65]

This Court was greatly impressed by Mr. Fink's experience, stature and candor, and method of thinking. However, this Court also highly respects Dr. Clee-

ton's background and testimony as well as the opinions stated by Drs. Hockenberry and Krause. The fact that a direct conflict in testimony existed between those experts in connection with the teaching of the French patent leads this Court to shy away from determining whether the French patent does or does not constitute an anticipation of the '549, particularly since it is not necessary for this Court to achieve a resolution of that question. While the French patent only discloses square wave generators, and one type of square wave generator in particular, namely, blocking oscillators, and thus may not constitute an anticipation of claim 13 of the Cleeton '549 which requires square wave generators of the monostable multivibrator type, the testimony of defendant's expert, Mr. Fink, which this Court finds convincing, and therefore accepts, was that the French patent could be only successfully practiced using monostable square wave generators such as blocking oscillators. Fink further stated, basing his testimony in part on two articles—Getting and Starr —which appeared in scientific journals during the 1930's,[66] that monostable mul-

---

60. Plaintiffs' Ex. 55, "Pulse Techniques," *supra* at 76–78. Because of the technical complexity of the factual issues involved in this case, the defendant's expert witness, Mr. Fink, prepared and submitted to this Court a "Glossary of Terms" (Plaintiffs' Ex. 54) and a memorandum entitled "Pulse Techniques" (Plaintiffs Ex. 55). Plaintiff as well as defendant adopted both the glossary and the memorandum which have proved most helpful to this Court.

61. T.Tr. 1493–95, 703–05.

62. T.Tr. 1039–44.

63. T.Tr. 1805–09.

64. T.Tr. 2333.

65. Dr. Cleeton, responding to defendant's Request for Admission No. 42 stated that the generators in the French '571 are discharge devices biased to cut off. A discharge device biased to cut off is monostable (T.Tr. 1890–92, 2377–80, 2585; "Pulse Techniques," *supra* at 71–73). Thus, if Dr. Cleeton is held to his admission, the generators in the French patent must be taken to be monostable.

However, in response to Request for Admission Nos. 40, 41 and 43, filed by plaintiffs in these proceedings at the same time as plaintiffs filed their response to No. 42, Dr. Cleeton denied that the French '571 generators were "pulse producing trigger circuits having a stable and an active state," thus taking the position in those responses that the circuits are not monostable, and asserting that they are in fact astable—as plaintiffs maintain herein. In short, Admission 42 was from the start, and remains, inconsistent with the other responses.

Dr. Cleeton has sought permission to withdraw Admission 42. This Court, denying that request, stated, during final argument, that Admission 42 would remain in the record but that it would not be deemed binding, *per se*, and would be considered in the light of the original inconsistency and Dr. Cleeton's later renunciation.

66. I. A. Getting, "Multivibrator Geiger Counter Circuit," The Physical Review, vol. LIII, 103 (2d Series 1938), Defendant's Ex. 1–AA; A. T. Starr, "A Trigger Peak Voltmeter Using 'Hard' Values,"

tivibrators were also a type of square wave generator known to the art in 1938. And, in addition, Fink testified that the White Patent, U. S. Patent No. 2,113,011, issued in 1938, teaches that monostable multivibrators, of the kind disclosed in claim 13 of the Cleeton '549, could be substituted for monostable blocking oscillators, of the kind that could be used to practice the French '571.

It is to be noted that the French '571 patent does not disclose the use of adjustable resistors. However, Mr. Fink testified that it would have been obvious to the man of ordinary skill in the art in and about 1940 that adjustable resistors could have been used to vary the duration of the active state of each of the monostable generators [67] and that the prior art, in particular the Koch patent,[67a] taught the use of variable resistors in the environment of the French patent and the Cleeton '549. The use of such resistors is therefore obvious under the principles enunciated in Marconi Wireless Telegraph Co. of America v. United States, *supra*.

The '549, like the '413, is a combination patent. Plaintiffs contend that the '549 teaches a new result, i. e., "the obtaining of precision pulse delay control for pulses, for electronic pulses." [67b] But the French patent states, *inter alia*,[68] "The triggering of the rectangular signals may be controlled in a very strict manner by the sending of brief pulses as a control grid of the oscillator." Thus, the claimed new result for the '549 patent was at least seemingly conceptually known to the art when the French patent was issued in 1938 and published in 1939.

Even assuming that Dr. Cleeton's disclosures in the '549 patent constituted an important advance, they did not achieve a new result of the type which is needed to resist the application of section 103 and its doctrine of obviousness.

In sum, considering together the disclosures of the French and White patents and the Getting and Starr articles, and the fact that their disclosures and teachings were known to the art before the '549 patent was issued or even applied for by Dr. Cleeton, this Court holds that claim 13 of the Cleeton '549 patent is invalid for obviousness under section 103.[68a]

Dissenting in Marconi Wireless Telegraph Company of America v. United States, 320 U.S. *supra* at 60, 63 S.Ct. at 1421, Mr. Justice Frankfurter warned (at 61-62, 63 S.Ct. at 1421-1422):

[S]o long as the Congress, for the purposes of patentability, makes the determination of originality a judicial function, judges must overcome their scientific incompetence as best they can. But consciousness of their limitations should make them vigilant against importing their own notions of the nature of the creative process into Congressional legislation, whereby Congress "to promote the Progress of Science and useful Arts" has secured "for limited Times to . . . Inventors the exclusive Right to their . . Discoveries." Above all, judges must avoid the subtle temptation of taking scientific phenomena out of their contemporaneous setting and reading them with a retrospective eye.

The Wireless Engineer 601–06 (November, 1935), Defendant's Ex. 1–Z.

67. T.Tr. 708.

67a. See discussion at p. 20, *supra*.

67b. Final Argument Tr. 238.

68. Defendant's Ex. 1–T–1 at 2.

68a. Defendant also cites the French '571 patent, as a prior art reference, the disclosures of which render the Cleeton '413 patent invalid. Without repeating the discussion with respect to the French

'571 and the Cleeton '549, this Court holds that it was obvious to one skilled in the art in and about 1940 that the blocking oscillators of the French patent could be replaced with the monostable trigger circuits of the '413 and that adjustable resistors could be used to vary the duration of the active states of those trigger circuits. Therefore, the Cleeton '413, like the Cleeton '549, is invalid for obviousness under 35 U.S.C. § 103 in the light of the disclosures of the French '571.

The discoveries of science are the discoveries of the laws of nature, and like nature do not go by leaps. Even Newton and Einstein, Harvey and Darwin, built on the past and on their predecessors. Seldom indeed has a great discoverer or inventor wandered lonely as a cloud. Great inventions have always been parts of an evolution, the culmination at a particular moment of an antecedent process. So true is this that the history of thought records striking coincidental discoveries— showing that the new insight first declared to the world by a particular individual was "in the air" and ripe for discovery and disclosure.

The real question is how significant a jump is the new disclosure from the old knowledge. Reconstruction by hindsight, making obvious something that was not all obvious to superior minds until someone pointed it out,—this is too often a tempting exercise for astute minds. The result is to remove the opportunity of obtaining what Congress has seen fit to make available.

In Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), which can fairly be described, at the very least, as a leading case on obviousness, Mr. Justice Clark quoted (at 14–15, 86 S.Ct. at 692, 15 L.Ed.2d 545) as follows from the 1952 Senate and House reports which accompanied the proposed enactment of section 102 to the floors of both Houses of the Congress:

"Section 103, for the first time in our statute, provides a condition which exists in the law and has existed for more than 100 years, but only by reason of decisions of the courts. An invention which has been made, and which is new in the sense that the same thing has not been made before, may still not be patentable if the difference between the new thing and what was known before is not considered sufficiently great to warrant a patent. That has been expressed in a large variety of ways in decisions of the courts and in writings. Section 103 states this requirement in the title. It refers to the difference between the subject matter sought to be patented and the prior art, meaning what was known before as described in section 102. If this difference is such that the subject matter as a whole would have been obvious at the time to a person skilled in the art, then the subject matter cannot be patented.

"That provision paraphrases language which has often been used in decisions of the courts, and the section is added to the statute for uniformity and definiteness. This section should have a stabilizing effect and minimize great departures which have appeared in some cases. * * * "

In Anderson's-Black Rock v. Pavement Salvage Co., 396 U.S. 57, 61–63, 90 S.Ct. 305, 308–309, 24 L.Ed.2d 258 (1969), Mr. Justice Douglas wrote:

In this case the question of patentability of the combination turns on the meaning of 35 U.S.C. § 103 which the court reviewed in the Graham case, supra, at 13–17, [86 S.Ct. at 691–693,] 15 L.Ed.2d at 553–556. We said:

"We believe that this legislative history, as well as other sources, shows that the revision was not intended by Congress to change the general level of patentable invention. We conclude that the section was intended merely as a codification of judicial precedents embracing the Hotchkiss condition, with congressional directions that inquires into the obviousness of the subject matter sought to be patented are a prerequisite to patentability." Id., at 17, [86 S.Ct. at 693,] 15 L.Ed. 2d at 556.

Obviousness, as an issue, is resolved as follows:

"Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved." Ibid.

We admonished that "strict observance" of those requirements is necessary. Id., at 18, [86 S.Ct., at 694,] 15 L.Ed.2d at 556.

\* \* \* We conclude further that to those skilled in the art the use of the old elements in combination was not an invention by the obvious-nonobvious standard. \* \* \* [Footnotes omitted.] [69]

In this case, this Court has attempted to take into account Mr. Justice Frankfurter's warning words in his dissent in *Marconi,* an anticipation case,[70] and

Mr. Justice Clark's and Mr. Justice Douglas' emphases in *Graham* and *Anderson* upon the meaning of section 103, before concluding, as it does, that both the Cleeton '413 and '549 patents are invalid for obviousness.

## B. DALLENBACH U. S. PATENT NO. 2,076,335

The parties agree that the sole factual issue with respect to anticipation of the Cleeton '549 by the Dallenbach patent is whether or not Dallenbach discloses a

69. In an earlier case, Great A. & P. Tea Co. v. Supermarket Equip. Corp., 340 U.S. 147, at 150–153, 71 S.Ct. 127, at 129–130, 95 L.Ed. 162 (1951), Mr. Justice Jackson wrote:

While this Court has sustained combination patents, it never has ventured to give a precise and comprehensive definition of the test to be applied in such cases. The voluminous literature which the subject has excited discloses no such test. It is agreed that the key to patentability of a mechanical device that brings old factors into cooperation is presence or lack of invention. In course of time the profession came to employ the term "combination" to imply its presence and the term "aggregation" to signify its absence, thus making antonyms in legal art of words which in ordinary speech are more nearly synonyms. However useful as words of art to denote in short form that an assembly of units has failed or has met the examination for invention, their employment as tests to determine invention results in nothing but confusion. The concept of invention is inherently elusive when applied to combination of old elements. This, together with the *imprecision of our language,* have counselled courts and text writers to be cautious in affirmative definitions or rules on the subject.

The negative rule accrued from many litigations was condensed about as precisely as the subject permits in Lincoln Engineering Co. [of Illinois] v. Stewart-Warner Corp., 303 U.S. 545, 549, 58 S.Ct. 662, 664, 82 L.Ed. 1008, 1010: "The mere aggregation of a number of old parts or elements which, in the aggregation, perform or produce no new or different function or operation than that theretofore performed or produced by them, is not patentable invention." To

the same end is Toledo Pressed Steel Co. v. Standard Parts, Inc., 307 U.S. 350, 59 S.Ct. 897, 83 L.Ed. 1334, and Cuno Engineering Corp. v. Automatic Devices Corp., 314 U.S. 84, 62 S.Ct. 37, 86 L.Ed. 58. The conjunction or concert of known elements must contribute something; only when the whole in some way exceeds the sum of its parts is the accumulation of old devices patentable. Elements may, of course, especially in chemistry or electronics, take on some new quality or function from being brought into concert, but this *is not a usual result of uniting elements old in mechanics.* This case is wanting in any usual or surprising consequences from the unification of the elements here concerned, and there is nothing to indicate that the lower courts scrutinized the claims in the light of this rather severe test.

\* \* \* \* \*

Courts should scrutinize combination patent claims with a care proportioned to the difficulty and improbability of finding invention in an assembly of old elements. The function of a patent is to add to the sum of useful knowledge. Patents cannot be sustained when, on the contrary, their effect is to subtract *from former resources freely available* to skilled artisans. A patent for a combination which only unites old elements with no change in their respective functions, such as is presented here, obviously withdraws what already is known into the field of its monopoly and diminishes the resources available to skillful men. This patentee has added nothing to the total stock of knowledge, but has merely brought together segments of prior art and claims them in congregation as a monopoly. [Footnotes omitted.]

70. See p. 1231 *supra.*

differentiator circuit.[71] If it does, then plaintiffs concede that claim 13 of the '549 is anticipated and invalid.

Although easily stated, the issue of whether or not Dallenbach discloses a differentiator circuit poses, even comparatively in this case, a most technically difficult question. Defendant's "Glossary of Terms" (at 13), which plaintiffs accept,[72] defines "differentiation" as that term is used in pulse electronics as:

The process of forming sharp pulses from the leading and trailing edges of a more extended pulse. Note: electric differentiation involves the production of an output current or voltage that is proportional to the speed of change of the imput current or voltage.

That general definition is further broken down into two types of differentiation: (1) capacitive differentiation which is—

The process of deriving sharp pulses from the leading and trailing edges of a more extended pulse, using a capacitor and resistor in combination.

and (2) inductive differentiation which is—

The process of deriving sharp pulses from the leading and trailing edges of a more extended pulse, in a circuit comprising an inductance and a resistance.[73]

Dr. Cleeton testified that the Dallenbach patent does not disclose a differentiator circuit.[74] During direct examination defendant's expert, Mr. Fink, testified that there was "exact correspondence" between the structure—that is, the presence of a differentiator circuit as described above—and the function of Dallenbach and the structure and function of the circuit claimed in claim 13 of the '549.[75] To demonstrate that correspondence, Mr. Fink drew a series of wave forms showing, in idealized fashion the formation by the operation of Dallenbach of sharp pulses from the leading and trailing edges of a more extended pulse.[76] Those wave forms are exactly the same as the ones described in the glossary definition of differentiation and also exactly the same as the ones formed by the operation of the '549 patent.[77] On cross-examination, however, Mr. Fink drew another set of wave forms to depict the operation of the Dallenbach patent.[78] In that drawing, the wave forms produced by Dallenbach are shown as half cosine waves, as compared with the sharp rectangular pulses with leading and trailing edges that are shown in the glossary, "Pulse Techniques," and the drawings illustrating the wave forms produced by the '549.

While this Court recognizes that the drawings of wave forms are highly idealized in the sense that they attempt to represent pictorially what the eye cannot see, the wave forms in Dallenbach do appear to be substantially different from those in the Cleeton '549. Moreover, they also appear to produce a somewhat different operation. In Dallenbach, the

---

71. The same issue was among those presented with respect to the Fitch patent, U. S. No. 2,210,574, which defendant originally cited as anticipatory prior art. However, during final argument, defendant moved to withdraw the Fitch patent as a reference because the issue of whether the prior art disclosed a differentiator circuit in a setting that constituted anticipation of the Cleeton '549 was presented with considerably less complexity by the Dallenbach patent. (Final argument Tr. 56. Plaintiffs did not object to defendant's withdrawing Fitch as a prior art defense, but requested that any testimony with respect to Fitch's disclosure of a differentiator circuit which relates directly to a similar disclosure by Dallenbach should remain available to this Court for consideration. Defendant agreed to that reservation in its motion to withdraw Fitch. This Court, in this opinion, writes within the confines of that agreement among counsel.

72. See n. 60 *supra*.

73. See also "Pulse Techniques," *supra* at 9–11, 31–36.

74. T.Tr. 2300–02, 2345–48.

75. T.Tr. 761–62.

76. Plaintiffs' Ex. 71.

77. Plaintiffs' Ex. 20.

78. Plaintiffs' Ex. 88.

tube or discharge device following the alleged differentiator circuit is rendered conducting or turned on prior to the termination of the current pulse. By contrast, the discharge tube in Cleeton '549 is turned on at a later time.[79]

Mr. Fink also testified that the Dallenbach patent disclosed no resistors associated with the alleged differentiator circuit and that, therefore, the differentiation in Dallenbach was between current imput and voltage output, not between voltage imput and voltage output.[80] However, both types of differentiation described in the glossary definition require a resistance, and the definition itself appears to refer to differentiation between voltage imput and voltage output. Furthermore, Dr. Cleeton testified that differentiation, as that concept was understood in pulse electronics and as existing in the differentiator circuit used in the '549, meant differentiation between voltage imput and voltage output, and did not refer to the current imput, voltage output differentiation which Mr. Fink testified was present in Dallenbach.[81]

Weighing the expert testimony presented by both parties and the patents and other references cited, this Court is not persuaded that the preponderance of all the evidence establishes that the Dallenbach patent discloses a differentiator circuit of the type claimed by the Cleeton '549. Accordingly, this Court holds that Dallenbach is not anticipatory prior art. Nor is there any evidence in this record that Dallenbach's teachings, considered together with the teachings of any other prior art, render obvious claim 13 of the Cleeton '549.

## III. SECTION 112—INDEFINITENESS

This Court's conclusion that the meaning of the word "coupling," as it was understood in the art about 1940, is ambiguous,[82] poses the question of whether both claim 13 of the '413 patent and claim 13 of the '549 patent (which uses the word "coupled" [83]) are invalid for indefiniteness under 35 U.S.C. § 112, which provides, in pertinent part:

> The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

In United Carbon Company v. Binney & Smith Company, 317 U.S. 228, 236, 63 S.Ct. 165, 170, 87 L.Ed. 232 (1942), Mr. Justice Jackson wrote:

> The statutory requirement of particularity and distinctness in claims is met only when they clearly distinguish what is claimed from what went before in the art and clearly circumscribe what is foreclosed from future enterprise. A zone of uncertainty which enterprise and experimentation may enter only at the risk of infringement claims would discourage invention only a little less than unequivocal foreclosure of the field. Moreover, the claims must be reasonably clearcut to enable courts to determine whether novelty and invention are genuine. * * *

See General Electric Co. v. Wabash Appliance Corp., 304 U.S. 364, 369, 58 S.Ct. 899, 82 L.Ed. 1402 (1938); Triumph Hosiery Mills v. Almanace, 299 F.2d 793, 801 (4th Cir. 1962).

While conceding that the specifications and drawings of both claim 13 of the '413 and claim 13 of the '549 specifically disclose or describe coincident coupling circuits, defendant urges that the scope of those two claims, as distinguished from the scope of their disclosures, is broad and undefined, thus creating the "zone of concertainty" proscribed by section

---

79. T.Tr. 1550–71.

80. T.Tr. 2292–93.

81. T.Tr. 2300–02.

82. See the discussion with respect to anticipation of the Cleeton '413 patent by the German articles, *supra*, at p. 21 et seq.

83. Claim 13 of the '549 patent describes "a differentiator circuit *coupled* between the negative output pulse electrode of said trigger and the imput pulse of said discharge device . . . ." (Emphasis added.)

112. In addition to the ambiguity surrounding the use of the word "coupling," it is relevant to examine the file history of the Cleeton patents in the United States Patent Office,[84] which shows that in 1946, while both the '413 and '549 application were still pending, United States Patent No. 2,402,917 (hereinafter the Miller patent) was issued to W. A. Miller. Because claims 5 and 9 of the Miller patent were very similar to subject matter claimed in the Cleeton '549 and the Cleeton '413 applications, Dr. Cleeton copied claim 9 and claim 5 of the Miller patent into his own applications. In a Patent Office interference proceeding held to determine whether Dr. Cleeton or Miller had priority of invention of the claims, Dr. Cleeton prevailed as to claim 5 of Miller. Accordingly, that claim was awarded to him and appears without change as claim 13 of the '549 patent.[85]

Because both claims 13 in the two Cleeton patents in issue in this case came from the Miller patent, the Miller patent's use of the term "coupling" is relevant in determining the scope of the Cleeton claims. If in the Miller patent, the coupling between the two trigger circuits produces coincident operation, as plaintiffs contend it does, then Miller reinforces plaintiffs' position that claims 13 in both Cleeton patents are narrowly and definitely confined to a coincident coupling. If, on the other hand, Miller discloses delay coupling circuits, then, at the very least, the scope of the two Cleeton patents is considerably more indefinite.

During cross-examination, Mr. Fink, defendant's expert, testified that in Miller there is no predetermined delay between the operation of the two trigger circuits and that, therefore, the two trigger circuits operate in coincidence.[86] Accepting that testimony, this Court concludes that Dr. Cleeton's claims in both the '413 and the '549 patents covered only coincident coupling and that the specifications and the drawings and the file histories of the patents describe with sufficient particularity, clarity and exactness the inventions claimed. Neither Cleeton patent is therefore invalid for indefiniteness under 35 U.S.C. § 112.

## IV. INFRINGEMENT

Although Dr. Cleeton originally contended that Hewlett-Packard manufactures and sells eight different pieces of electronic equipment employing a total of fourteen circuits which infringe the '549 patent and also manufactures and sells fourteen electronic devices containing circuits which infringe the '413 patent, that host of infringement contentions was greatly reduced by agreement between the parties prior to trial. The parties stipulated that all the issues of infringement of claim 13 of the '549 patent could be resolved by this Court by considering only four of the circuits in the accused Hewlett-Packard devices.[87] The parties further agreed that those four accused circuits employ each element and each limitation of claim 13 of the '549 patent, except that the parties excepted from their said agreement any meeting of their minds with regard to the now familiar word "coupled." [88] Thus, the issue of infringement of the '549 patent narrows to the question of whether in each of defendant's accused devices the differentiator circuit is "coupled" between the trigger circuit and the discharge device as required by claim 13.

---

84. *Cf.* Morpul, Inc. v. Glen Raven Knitting Mill, Inc., 357 F.2d 732, 734 (4th Cir. 1966):

In interpreting the claim of the patent, resort may properly be had to the prior state of the art, the specifications and, when related claims have been rejected by the Patent Office, to the file wrapper history.

85. The Patent Office dissolved the interference as to claim 9 of Miller. However, claims 5 and 9 in Miller are very similar.

86. T.Tr. 1238–39.

87. Pretrial Order, D, ¶¶ 9–11.

88. Pretrial Order, F, ¶¶ 3–5.

With respect to the '413 patent, the parties agreed that the issues of infringement could be decided by considering only six of the accused circuits in defendant's equipment and that those circuits contain each claim and each limitation of claim 13 except that defendant denies that the two trigger circuits in the accused circuits are "similar" or that those two trigger circuits are coupled together as required by claim 13 of the '413 patent.

Defendant seems to rest almost its entire case for noninfringement of both the '549 and the '413 on what has been termed the doctrine of equivalents. In Graver Tank & Mfg. Co. v. Linde Air Products Co., 339 U.S. 605, 608–609, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1949), Mr. Justice Jackson, explaining that doctrine, wrote:

> The essence of the doctrine [of equivalents] is that one may not practice a fraud on a patent. Originating almost a century ago in the case of Winans v. Denmead (U.S.) 15 How. 330, 14 L. Ed. 717, it has been consistently applied by this Court and the lower federal courts, and continues today ready and available for utilization when the proper circumstances for its application arise. "To temper unsparing logic and prevent an infringer from stealing the benefit of the invention" a patentee may invoke this doctrine to proceed against the producer of a device "if it performs substantially the same function in substantially the same way to obtain the same result." Sanitary Refrigerator Co. v. Winters, 280 U.S. 30, 42, 50 S.Ct. 9, 13, 74 L.Ed. 147, 156. The theory on which it is founded is that "if two devices do the same work in substantially the same way, and accomplish substantially the same result, they are the same, even though they differ in name, form, or shape." Union Paper-Bag Machine Co. v. Murphy, 97 U.S. 120, 125, 24 L.Ed. 935, 936. The doctrine operates not only in favor of the patentee

of a pioneer or primary invention, but also for the patentee of a secondary invention consisting of a combination of old ingredients which produce new and useful results. [Citations omitted] The wholesome realism of this doctrine is not always applied in favor of a patentee but is sometimes used against him. *Thus, where a device is so far changed in principle from a patented article that it performs the same or a similar function in a substantially different way, but nevertheless falls within the literal words of the claim, the doctrine of equivalents may be used to restrict the claim and defeat the patentee's action for infringement.* Westinghouse v. Boyden Power Brake Co., 170 U.S. 537, 568, 18 S.Ct. 707, 722, 42 L.Ed. 1136, 1137. * * * [Emphasis added; footnote omitted.]

*See* Foster Cathead v. Hasha, 382 F.2d 761 (5th Cir. 1967); Bullard Co. v. General Electric Co., 348 F.2d 985 (4th Cir. 1965).

Defendant attempts to bring itself within the protections of that doctrine by contending, as it did with regard to the defense of indefiniteness under 35 U.S.C. § 112, that in both the '549 and the '413 Dr. Cleeton made a broad claim based upon a narrow limited disclosure and that even though the claims of the two Cleeton patents may literally read element-by-element on the defendant's accused devices, neither of the two Cleeton patents exhibit that substantial identity of operation and result with the accused devices necessary to establish infringement. Foster Cathead Co. v. Hasha, *supra*, 382 F.2d at 765. The alleged difference in operation and result between the Cleeton patents and the accused devices to which defendant points is that in the Cleeton patents the two trigger circuits operate in coincidence while the accused circuits, which are admittedly identical to the circuits in the Miller patent,[89] operate with an intentional time lag between the action of the

89. The circuits claimed in both the Cleeton '549 and Cleeton '413 were taken from the Miller patent. See pages 1235–1236, *supra*.

two trigger circuits. That contention has, however, been resolved against the defendant by this Court's finding, based upon the testimony of defendant's expert, Mr. Fink, that the monostable trigger circuits disclosed in Miller operate in coincidence.[90]

 Additionally, however, defendant argues that even if its accused circuits do operate in coincidence, that coincidence is different enough from the coincidence employed in the Cleeton patents so that there is not the substantial equivalence or identity necessary to establish infringement. According to that argument, the Cleeton patents disclose coincidence between the leading edge of the pulse produced by the first trigger circuit and the leading edge of the pulse produced by the second trigger circuit while in the accused devices (and in the Miller patent) the leading edge of the pulse from the second trigger circuit is in coincidence with the trailing edge of the pulse from the first trigger circuit.[91] But that argument ignores the fact that in one mode of operation of the Cleeton '413 patent the second trigger circuit changes its state in coincidence with the trailing edge of the pulse produced by the first trigger circuit,[92] exactly as disclosed by the Miller patent and the accused devices.[93] Furthermore, Mr. Fink's testimony suggests that achieving coincidence between the leading edge of the pulse from the second trigger circuit and the trailing edge of the pulse from the first trigger circuit was well known in the art in and about 1940 and was obvious to one schooled therein.[93] The state of knowledge in the art is an important factor in establishing equivalency. Graver Tank & Mfg. Co. v. Linde Air Products Co., *supra*, 339 U.S. at 609, 70 S.Ct. 854.

Accordingly, this Court holds that the accused Hewlett-Packard devices perform "substantially the same function in substantially the same way to obtain the same result." Sanitary Refrigerator Company v. Winters, 280 U.S. 30, 42, 50 S.Ct. 9, 13, 74 L.Ed. 147 (1929). Therefore, this Court holds that the Cleeton patents are infringed by the accused devices. Thus, if this Court is in error under I and II, *supra*, plaintiffs are entitled to judgment herein.[94] However, for the reasons stated under I and II, *supra*, this Court holds both of the Cleeton patents invalid for obviousness. Judgment for the defendant will be entered, with costs to be borne by the plaintiffs. It is so ordered.

---

90. See the discussion at p. 1236 *supra*.

91. Final Argument Tr. 354; T.Tr. 1242–43.

92. Mr. Fink testified that leading edge, trailing edge coincidence was disclosed by the Cleeton '413. See also Plaintiffs' Proposed Findings of Fact No. 92 and Conclusions of Law stating that position

and defendant's agreement in that connection.

93. T.Tr. 1245–50.

94. In that event, the issue of willful infringement, which the plaintiffs pose, along with all damage issues, will require further proceedings and adjudication.