**VIVUS, INC, Plaintiff**

v.

**Josef E. KERCSO, Defendant.**

**Josef E. KERCSO, Counterclaimant,**

v.

**VIVUS, INC., Leland F. Wilson, and Virgil A. Place, Counterclaim defendants.**

**No. C–96–20422 EAI.**

United States District Court,
N.D. California,
San Jose Division.

Sept. 9, 1997.

Ron E. Shulman, Wilson Sonsini Goodrich & Rosati, Palo Alto, CA, for Plaintiff and Counterclaim defendants.

Gary L. Olimpia, Olimpia, Whelan & Lively, San Jose, CA, for Defendant and Counterclaimant.

## ORDER DENYING COUNTERCLAIM DEFENDANTS' MOTION FOR SUMMARY JUDGMENT RE: INVENTORSHIP ISSUES

INFANTE, United States Magistrate Judge.

### I. INTRODUCTION

Counterclaim defendants Vivus, Inc., Dr. Virgil A. Place, and Leland F. Wilson move for a summary judgment on Counterclaimant Josef E. Kercso's First and Second Causes of Action. Counterclaim defendants request that summary judgment be entered on Kercso's claim that he is the sole inventor, or at least a co-inventor, of the subject matter disclosed in the '391 and '535 patents, and on the claim that the patents should be declared invalid and/or unenforceable due to Kercso's wrongful omission as a named inventor. For the reasons set forth below, the motion for summary judgment is DENIED.

### II. BACKGROUND FACTS AND THE PARTIES' CONTENTIONS

The central dispute in this inventorship case involves the nature of the relationship between Dr. Place and Mr. Kercso in 1990 and 1991. Dr. Place, one of the named inventors on both U.S. Patent No. 5,242,391 (Urethral Insert for Treatment of Erectile Dysfunction) and U.S. Patent No. 5,474,535 (Dosage and Inserter for Treatment of Erectile Dysfunction)[1], claims that he merely consulted Mr. Kercso for assistance in building prototypes and models of his designs of devices for delivering medication into the urethra to treat erectile dysfunction. Dr. Place contends that Mr. Kercso made no inventive contribution. Mr. Kercso, on the other hand,

---

1. The two other named inventors on the '391 and '535 patent, Mr. Robert Gale and Mr. Randall Berggren, are not parties to this action. The parties agree that Mr. Gale and Mr. Berggren worked only on the therapeutic medication to be delivered to the urethra by the methods disclosed in the patents-in-suit.

claims that Dr. Place invited him to be one of the founding members of Vivus and that he, not Dr. Place, came up with the breakthrough designs disclosed in the patents-in-suit.

### Summary of the '391 and '535 patents

The '391 and '535 patents both relate to the delivery of medication into the urethra of impotent men to allow them to achieve an erection. There are a total of three methods (with their corresponding apparatus) disclosed in the patents. The first method is referred to by the parties as the "dipstick" method. This method, which is described in claim 1 of the '391 patent, calls for coating a thin shaft of material (such as plastic) with the medication and inserting the shaft into the urethra. The problem with the "dipstick" method is that it is difficult to control the dosage. The ability to precisely control the dosage is very important because if too little medication is applied, the patient will not be able to achieve an erection, and if too much is applied, the erection will last several hours.

The need to control the dosage of medication led to the development of the second delivery method, called the "plunger" or "plunger-injector" method. This second method, which is described in claim 6 of the '391 patent and claim 18 of the '535 patent, requires the medication to be formed into a pellet and placed at the end of a hollow shaft. As the hollow shaft is inserted into the urethra, the patient compresses a plunger which ejects the medication. Claim 7 of the '391 patent discloses a locking mechanism which prevents the accidental ejection of the pellet of medication before the shaft is inserted into the urethra.

The third method is called the "tulip" method. The "tulip" method was developed in response to the discovery of a prior art patent, the "Voss patent", on or about June 17, 1991, and is described in claim 19 of the '535 patent. The "tulip" design is comprised of a hollow shaft with a plunger and a flexible closed end where the pellet is placed. The flexible end can be inverted to contain a pellet of medication, and the plunger or injector ejects the pellet by everting the flexible end.

### The development of the "dipstick" and "plunger" devices

Dr. Place began work on the development of therapeutic agents and delivery systems to treat erectile dysfunction or impotence in 1987, when he was employed by Alza Corporation in Palo Alto.[2] In April 1989, Dr. Place filed an Invention Disclosure Record ("IDR") with Steve Stone, Alza's in-house patent attorney, describing his technique of treating impotence through the transurethral administration of medication. Mr. Gale and Mr. Berggren, researchers at Alza, assisted with the formulation of the medication to be delivered. On April 25, 1990, the original patent application was filed naming Dr. Place, Mr. Gale and Mr. Berggren as inventors. Only the "dipstick" method was disclosed in the April 25, 1990 application. There is no dispute regarding Dr. Place's invention of the original "dipstick" method.

Dr. Place contends that he invented the "plunger" method in the months after the original patent application was filed. Vivus Exh. 10, ¶ 3. Dr. Place's claim, though supported by some documentary evidence, is unquestionably not established.[3] The first supporting document is Dr. Place's August 19, 1990 handwritten facsimile to Alza's patent attorney, Steve Stone, regarding the anticipated filing of a continuation-in-part to the April 25, 1990 application. Vivus Exhs. 10, ¶ 4 and 10A. In the August 19, 1990 facsimile, Dr. Place states, "Another [design] is to take the present obturator and make hollow center and put plunger to eject dose—

---

2. Alza Corporation, founded in 1968, develops and commercializes pharmaceutical products using advanced drug delivery technologies.

3. The problem with Dr. Place's contention is that he does not have much corroborating evidence. First, other than the two handwritten memoranda to Steve Stone and the one entry in his notebook, Dr. Place's development of the signifi-

cant "plunger" design apparently went unchronicled. In fact, he gives no specific information—such as the date of conception or reduction to practice—about the development of the "plunger" design. He merely asserts that he made the invention sometime before the August 19, 1990 facsimile to Steve Stone was sent. Vivus Exh. 10, ¶ 3.

the dose can be filled in tip or inserted into tip." Vivus Exh. 10A. The second document is Dr. Place's handwritten memorandum to Steve Stone dated October 3, 1990 which contains two crude drawings of the "plunger" device. Vivus Exh. 10B. Also, Dr. Place cites to the September 30, 1990 entry in his notebook in which he states that he spoke with Nathan Roth, an Alza employee, "about cap and cylinder of drug overcoat of rod of drug in inserter with plunger." Vivus Exh. 10D.

During the fall of 1990, Alza apparently decided not to pursue Dr. Place's erectile dysfunction therapy project. Dr. Place and Alza reached an agreement in which Alza would continue to assist Dr. Place in obtaining patent rights on his work. Alza allowed Dr. Place to use its office space and its laboratory facilities to conduct further experiments related to the project. However, Dr. Place was apparently not allowed to use Alza employees to assist in his experiments. Any patents issued to Dr. Place or his colleagues would still belong to Alza. However, Alza agreed to grant Dr. Place the option to obtain licenses under the patents. In February 1991, Dr. Place started Vivus, Inc.

Since Dr. Place could no longer use Alza employees to help in his project, he decided to consult Mr. Kercso. Dr. Place became acquainted with Mr. Kercso while both men worked for Syntex in the 1960's. Although Dr. Place left Syntex to go to Alza in the late 1960's, the two men apparently kept in touch over the years. Dr. Place knew that Mr. Kercso had set up a machine shop in his home and that he could construct models and make scale drawings.

Dr. Place went to Mr. Kercso's Palo Alto home on November 23, 1990 to discuss the erectile dysfunction therapy project. The parties do not dispute that Mr. Kercso had no involvement in the project prior to November 23, 1990. The parties disagree about the relationship established between the two men on that date. Dr. Place maintains that he merely hired Mr. Kercso as a design consultant to fabricate models and make scale drawings. Mr. Kercso contends that Dr. Place asked him to join him as a "founding member" of Vivus, Inc. The parties did not execute any written agreement on November 23, 1990.

According to Mr. Kercso, he and Dr. Place spent many hours and days together during the period after November 23, 1990 discussing improvements to the design of the "dipstick" device. Mr. Kercso states that Dr. Place never told him about the so-called "plunger" device he had apparently designed by August 19, 1990. Dr. Place does not dispute this claim. Mr. Kercso made several scale drawings of improvements to the "dipstick" which are attached as Exhibit 46 to his declaration. The drawings show five separate versions of the "dipstick" labeled TUTS–1 (Transurethral Treatment System) through TUTS–5. After reviewing the TUTS–5 design drawing, which is dated December 21, 1990, Dr. Place agreed that injection molds should be made for production-quality models. They obtained the molds and models from L & H Precision Tool & Molding Company in Hayward. A quote for same was obtained on January 3, 1991. Kercso Exh. L. The TUTS–5 models were produced by L & H by February 1991. Mr. Kercso states that he and Dr. Place tested the TUTS–5 models in February 1991 in Alza's laboratory and found serious problems obtaining a uniform coating of medication on the shaft.

Mr. Kercso states that he was quite disappointed with the test results on the TUTS–5 models and therefore decided to improve upon the "dipstick" design. Mr. Kercso relates that he was inspired by an earlier invention he made, disclosed in U.S. Patent No. 4,105,030 ("the '030 patent"), issued on August 8, 1978, entitled "Implant Apparatus." Kercso Exh. 34. The '030 patent generally describes an apparatus for subcutaneously implanting drug pellets in animals. The patent discloses a device which looks very much like a gun onto which a hollow needle containing drug pellets can be affixed. To deposit the drug pellets into the animal, the user inserts the needle into the animal and pulls the trigger device which retracts the needle. The pellets are then left in the channel made by the inserted needle. Dr. Place does not address the purported simi-

larity between the "plunger" design and the device described in the '030 patent.

Mr. Kercso claims that he developed the "plunger" design sometime between February 10 and 20 of 1991 and made a prototype which he showed Dr. Place. He claims that he made two rough drawings for Dr. Place when he showed him the prototype at Alza's laboratory sometime between February 10 and 20 of 1991. Kercso Exhs. 49 and 50.[4] The drawings, however, are not dated. Mr. Kercso states that he designed the locking mechanism disclosed in claim 7 of the '391 patent at about the same time that he developed the "plunger" design.

As indicated earlier, Dr. Place states that he was working with Steve Stone on the continuation-in-part application starting in August 1990. He presented two handwritten memoranda, one dated August 19, 1990 and the other October 3, 1990, that he sent to Steve Stone to assist in the preparation of the continuation-in-part application. The next communication between Dr. Place and Mr. Stone regarding the continuation-in-part application occurred on March 4, 1991 when Dr. Place sent another handwritten memorandum to Mr. Stone. In the March 4, 1991 memorandum, Dr. Place tells Mr. Stone that:

> Present inserter is model given to you last week ... The suppository (LODE) inserted into the hollow end of the inserter with and obturator to eject has been made and looks promising. *The platform I gave you has had a 1.5 mm. hole drilled to make a hollow pipe.* The Lode is 1.5 mm. And made from a solid PEG and is preloaded into tip. When inserter is positioned fully into the urethra (in present manifestation that is 3 cm.) the Lode is discharged by pressing the obturator. See figure attached.

Kercso Exh. N (emphasis added). The referenced figure attached to the March 4, 1991 memorandum is a rough drawing of the "plunger" device dated February 27, 1991 disclosing a locking mechanism. Mr. Kercso correctly points out that this is the first time

Dr. Place disclosed the locking mechanism to his patent attorney.

On March 1, 1991, patent attorney Steve Stone contacted Anne Mahood for the purpose of drafting figures for the continuation-in-part application. Mr. Stone's correspondence with Ms. Mahood is attached as Exhibit 93 to Mr. Kercso's declaration. Mr. Stone initially requested only that figures depicting the "dipstick" design be drawn. Then, on March 6, 1991, Mr. Stone sent a facsimile to Ms. Mahood with rough sketches of proposed figures 4 and 5. In his fax cover sheet, Mr. Stone wrote, "Anne—2 new figures to add to drawings. If you can fit all figures on 1 sheet, please do." Proposed figure 4 shows the "plunger" device with the locking mechanism and proposed figure 5 shows the pellet of medication to be used with the "plunger" delivery system.

Mr. Kercso argues that the later disclosure of the "plunger" figures proves that the continuation-in-part was only intended to include the improved "dipstick" design, but this position is not supported by the evidence or common sense. First, there simply is not enough evidence presented regarding the April 25, 1991 continuation-in-part application to determine what the parties intended to include and whether the scope of the application changed as a result of Mr. Kercso's work. Second, Mr. Kercso testifies in his declaration that he disclosed the prototype of the "plunger" device to Dr. Place between February 10 and 20 of 1991. Therefore, the addition of figures 4 and 5 on March 6, 1991 to the original drafting request submitted on March 1, 1991 does not prove that Dr. Place misappropriated Mr. Kercso's idea.

During the period from November 1990 through March 1991, Mr. Kercso was not compensated for his work on the transurethral treatment system. Mr. Kercso argues that this supports his position that he was not an employee or contractor, but was in fact a founding member of Vivus, Inc. Dr. Place explains that he told Mr. Kercso that he did not have the ability to pay him until he could obtain venture capital funding and

---

4. Mr. Kercso also attached color photocopies of photographs of his prototypes of the "plunger" device as Exhibits 51 and 52. However, the photocopies are of such poor quality that it is difficult to determine precisely what they depict.

that Mr. Kercso would be compensated, in part, through the issuance of stock. On April 16, 1991, at the first board of directors meeting of Vivus, Inc., the company was authorized to sell Mr. Kercso 40,000 shares of Vivus stock at a price of $0.001 per share. Kercso Exh. 24.[5] Beginning in December 1991, Mr. Kercso began receiving compensation as a consultant of Vivus. Kercso Exh. 61.[6]

### Facts related to the development of the "tulip" transurethral treatment system design

The "tulip" design was developed in response to the discovery of the Voss prior art patent on or about June 17, 1991. The Voss patent generally described the use of a catheter to introduce medication into the urethra. A venture capital firm found the Voss reference and brought it to Vivus' attention. The firm withdrew its investment of several million dollars in Vivus as a result of the discovery of the Voss patent.

Dr. Place states that he and Leland Wilson[7], who is also a Counterclaim defendant, were very concerned about the Voss patent. They held brainstorming sessions in Dr. Place's office at Alza to think of ways to design around the Voss patent. During one of these sessions, Dr. Place came up with the "tulip" design and sketched it on a chalkboard which was apparently in his office. Dr. Place and Mr. Wilson then walked down the hall to Mr. Stone's office and disclosed the "tulip" design to him. Mr. Stone was impressed with the idea and decided that another continuation-in-part application should be filed. He asked for engineering drawings of the "tulip" design. Dr. Place then explained the concept to Mr. Kercso and asked him to render the drawings for Mr. Stone. Mr. Kercso's drawing of the "tulip" design is dated July 22, 1991.

Mr. Kercso has a completely different version of how the "tulip" design was developed. According to Mr. Kercso, Mr. Wilson asked him to lunch sometime in late June or early July of 1991. Mr. Wilson told him that the company was in dire straits because the Voss patent appeared to anticipate or render obvious the "dipstick" and "plunger" designs and that the company had just lost millions of dollars in venture capital financing. Mr. Wilson apparently asked Mr. Kercso to make modifications to the existing designs to get around the Voss patent. After working on the problem for a few weeks, Mr. Kercso came up with the "tulip" design and set forth the design in his July 22, 1991 drawing. Mr. Kercso told Dr. Place and Mr. Wilson that he had solved the problem and invited them to his house to see the "tulip" design drawing on July 22, 1991.

Dr. Place and Mr. Wilson expressed great satisfaction with the "tulip" design and believed that it avoided the Voss patent. Mr. Wilson then apparently promised Mr. Kercso an additional 60,000 shares of Vivus stock for his enormous contribution to the company. Mrs. Kercso then wrote on the July 22, 1991 drawing "Reviewed and Understood" and signed the document. Mr. Kercso and Dr. Place then also signed the document. Mr. Kercso contends the purpose of the signature was to acknowledge that he designed the "tulip" device. Dr. Place stated in his deposition that he signed the document merely because he was asked to do so, and that he had no understanding of the purpose for the signature.

### III. SUMMARY JUDGMENT STANDARDS

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories,

5. The board also authorized the sale of company stock to the following persons at the same price on that date: Dr. Place (5,050,000 shares), WS Investments (135,000), Mario M. Rosati (15,000), John Urquhart (40,000), Dr. Catherine Orentreich (55,000), Sari Orentreich (55,000), Eduardo Ortega (20,000), Hans Herman of L & H (8,000), Max Anlicker (10,000) and John S. Morse & Annette R. Morse, as trustees of the John S. & Annette R. Morse Trust (25,000).

6. Mr. Kercso claims that he did not join Vivus as a board member or officer because he was still employed by Syntex. He claims that the parties were concerned about the possibility that Syntex would attempt to claim rights in the transurethral treatment system patents. Finally, Mr. Kercso contends that he and Dr. Place agreed that he would join Vivus upon his retirement with full benefits from Syntex in 1994.

7. Mr. Wilson is Vivus' President and Chief Executive Officer.

and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(c). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). However, the moving party has no burden to negate or disprove matters on which the non-moving party will have the burden of proof at trial. The moving party need only point out to the court that there is an absence of evidence to support the non-moving party's case. *Id.* at 325, 106 S.Ct. at 2554.

The burden then shifts to the non-moving party to "designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. at 2553. To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). "The mere existence of a scintilla of evidence ... will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). Evidence that "is merely colorable, or is not significantly probative," is not sufficient to avoid summary judgment. *Id.* at 249–50, 106 S.Ct. at 2511.

Summary judgment cannot be granted where a genuine dispute exists as to any material fact. Fed. R. Civ. Proc. 56(c). A "material" fact is one which might affect the outcome of the case under the applicable law. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. A dispute about a material fact is genuine if a reasonable jury could return a verdict for the non-moving party. *Id.* In deciding a motion for summary judgment, the evidence is viewed in the light most favorable to the non-moving party, and all justifiable inferences are to be drawn in its favor. *Id.* at 255, 106 S.Ct. at 2513. Moreover, "[c]redibility determinations, the weighing of the evidence, and

the drawing of legitimate inferences from the facts are jury functions, not those of a judge [when] he is ruling on a motion for summary judgment." *Id.*

## IV. DISCUSSION

### *Applicable Statute*

Counterclaimant's inventorship causes of action are brought pursuant to 35 U.S.C. § 256, which provides:

Whenever through error a person is named in an issued patent as the inventor, or through error an inventor is not named in an issued patent and such error arose without any deceptive intention on his part, the Commissioner may, on application of all the parties and assignees, with proof of the facts and such other requirements as may be imposed, issue a certificate correcting such error.

The error of omitting inventors or naming persons who are not inventors shall not invalidate the patent in which such error occurred if it can be corrected as provided in this section. The court before which such matter is called in question may order correction of the patent on notice and hearing of all parties concerned and the Commissioner shall issue a certificate accordingly.

Until very recently, courts had interpreted the statute to apply only to inventorship errors not involving an allegation of deception or fraud. *Bemis v. Chevron Research Co.,* 599 F.2d 910, 913 (9th Cir.1979); *University of Colorado Foundation, Inc. v. American Cyanamid,* 880 F.Supp. 1387, 1399 (D.Colo. 1995). However, the Federal Circuit overruled this line of cases in a decision published on July 11, 1997, *Stark v. Advanced Magnetics, Inc.,* 119 F.3d 1551, 1556–57 (Fed.Cir. 1997).

### *Applicable Legal Standard*

■ The presumption of validity that attaches to all issued patents includes a presumption that the inventors are correctly named. *Hess v. Advanced Cardiovascular Sys., Inc.,* 106 F.3d 976, 980 (Fed.Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 2459, 138 L.Ed.2d 216 (1997). Furthermore, parties

claiming improper inventorship under 35 U.S.C. § 256 need to support their case with clear and convincing evidence. *Id.; Lamb–Weston, Inc. v. McCain Foods, Inc.,* 818 F.Supp. 1376, 1391–92 (E.D.Wash.1993), *aff'd in part, vacated in part,* 78 F.3d 540 (Fed. Cir.1996). In *Price v. Symsek,* 988 F.2d 1187, 1191 (1993), the Federal Circuit explained:

> A requirement of proof by clear and convincing evidence imposes a heavier burden upon a litigant than that imposed by requiring proof by preponderant evidence but a somewhat lighter burden than that imposed by requiring proof beyond a reasonable doubt. (Citation omitted.) "Clear and convincing" evidence has been described as evidence which produces in the mind of the trier of fact an abiding conviction that the truth of a factual contention is "highly probable."

*Id.* Finally, the Court ruling on a motion for summary judgment must be guided by the applicable "clear and convincing" evidentiary standard. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). The *Anderson* court explained:

> [W]here the ... "clear and convincing" evidence requirement applies, the trial judge's summary judgment inquiry as to whether a genuine issue exists will be whether the evidence presented is such that a jury applying that evidentiary standard could reasonably find for either the plaintiff or the defendant. Thus, where the factual dispute concerns actual malice, clearly a material issue in a *New York Times* [libel] case, the appropriate summary judgment question will be whether the evidence in the record could support a reasonable jury finding either that the plaintiff has shown actual malice by clear and convincing evidence or that the plaintiff has not ... [T]he plaintiff, to survive the defendant's motion, need only present evidence from which a jury might return a verdict in his favor. If he does so, there is a genuine issue of fact that requires a trial.

*Id.* at 255–57, 106 S.Ct. at 2514. The *Anderson* court cautioned, however, that its holding that the "clear and convincing" standard should be applied on a motion for summary judgment does not authorize the weighing of conflicting evidence by the court. *Id.* at 255, 106 S.Ct. at 2513 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").

### Law of Inventorship

In order to prevail on his counterclaim, Mr. Kercso must be able to prove through the presentation of clear and convincing evidence that he is the sole or co-inventor of any claim of the '391 or '535 patents. *See U.S. v. Telectronics,* 658 F.Supp. 579, 592 (D.Colo. 1987) (Not all co-inventors need to have combined efforts on each claim; if any inventor contributed to any claim, he should be named).

■ In order to show inventorship, Mr. Kercso must prove prior conception of the invention and he must also present evidence other than his own testimony to corroborate his claim. *Amax Fly Ash Corp. v. U.S.,* 206 Ct.Cl. 756, 514 F.2d 1041, 1047 (1975). In *Burroughs Wellcome Co. v. Barr Laboratories, Inc.,* 40 F.3d 1223, 1227–28 (Fed.Cir. 1994), the Federal Circuit explained that, "Conception is the touchstone of inventorship, the completion of the mental part of invention ... [and it] is complete only when the idea is so clearly defined in the inventor's mind that only ordinary skill would be necessary to reduce the invention to practice, without extensive research or experimentation."

Furthermore, the law does not restrict the scope of evidence that may be presented to corroborate a claim of inventorship. Instead, cases have held that "the existence of corroboration is to be determined by viewing the evidence as a whole." *Amax,* 514 F.2d at 1047. More recently, in *Price,* the Federal Circuit stated that:

> A rule of reason analysis is applied to determine whether the inventor's prior conception testimony has been corroborated. *Coleman* [*v. Dines,*] 754 F.2d at [353] 360, 224 U.S.P.Q. [857] at 862 [ (Fed.Cir. 1985) ]. *See also Holmwood v. Sugavanam,* 948 F.2d 1236, 1238, 20 U.S.P.Q.2d 1712, 1714 (Fed.Cir.1991) (applied in reduction to practice determination); *Berry v. Webb,* 56 C.C.P.A. 1272, 412 F.2d 261,

266, 162 U.S.P.Q. 170, 174 (1969) ("There is no single formula that must be followed in proving corroboration."). An evaluation or all pertinent evidence must be made so that a sound determination of the credibility of the inventor's story may be reached. *Price*, 988 F.2d at 1195. Therefore, in order to survive summary judgment, Mr. Kercso must be able to show that he has sufficient evidence of conception, including corroborative evidence, from which a reasonable jury could find that he invented at least one claim in the '391 and '535 patents.

### Analysis regarding inventorship of the '391 patent

As indicated earlier, Mr. Kercso need only show that a genuine issue remains regarding the inventorship of any claim of the '391 patent to defeat the summary judgment motion on the First Cause of Action. Mr. Kercso does not claim that he played any part in the conception of the "dipstick" design disclosed in claim 1 of the '391 patent. He claims that he invented or co-invented the "plunger" design which is disclosed in claim 6 (and claim 18 of the '535 patent) and the locking mechanism disclosed in claim 7.

■ Mr. Kercso has established that factual issues remain regarding the inventorship of the '391 patent. First, the documents presented by Dr. Place, although persuasive, do not establish his prior conception of the "plunger" design since absolutely nothing is disclosed about the development process. Vivus Exhs. 10A, 10B and 10D. Although Dr. Place will not have the burden of proof at trial, he must either prove that he independently conceived the "plunger" design before Mr. Kercso or that Mr. Kercso lacks evidence to support his claim of inventorship.

Mr. Kercso testified that when Dr. Place met with him in his home on November 23, 1990, he did not mention that he had conceived of any design other than the "dipstick"

design. In the months that followed, he and Dr. Place worked only on improving the "dipstick" design. Exh. 46 to Kercso Declaration. This assertion is corroborated by the fact that Mr. Kercso and Dr. Place asked L & H Precision Tool & Molding Company to make molds and models of only the "dipstick" device. Kercso Exh. L. Mr. Kercso's assertion is also corroborated by the declaration testimony of his wife, Elissa Tallmon Kercso, submitted in opposition to the motion for summary judgment.[8] Mr. Kercso also submitted color photocopies purportedly depicting the rough models he created embodying the "plunger" design. *See* Exhs. 51 and 52 to Kercso Declaration.

Mr. Kercso's claim that he independently conceived of the "plunger" design and locking mechanism is also corroborated by Dr. Place's March 4, 1991 memorandum to Mr. Stone. On pages 3 and 4 of the handwritten memorandum, Dr. Place discloses that he provided Mr. Stone with a "model" or "platform" of the "plunger" device "last week." Since the record before the Court indicates that Dr. Place did not make any models of the "plunger" device before March 4, 1991, the referenced object appears to be one of the plexiglass prototypes made by Mr. Kercso between February 10 and 20 of 1991.[9] Finally, Mr. Kercso provided two rough drawings, which he says were made between February 10 and 20 of 1991, depicting his "plunger" design. *See* Exhs. 49 and 50 to Kercso Declaration. Mr. Kercso's evidence regarding the "plunger" design, though not overwhelming, is sufficient to raise serious factual questions regarding the conception of the "plunger" device.

Substantial doubt also surrounds the invention of the locking mechanism disclosed in claim 7 of the '391 patent. Dr. Place has not provided the Court with any evidence that he invented the locking mechanism prior to

---

8. Counterclaim defendants have filed a motion to strike portions of Mrs. Kercso's declaration. However, it is clear that she has sufficient personal knowledge regarding her conversations with Dr. Place and Mr. Kercso to give admissible testimony. Also, she should be allowed to testify regarding hearsay statements made by Dr. Place since he is the party opponent in this case.

9. The fact that Dr. Place gave Mr. Stone one of Mr. Kercso's prototypes does not prove that Mr. Kercso invented the "plunger" device since Mr. Kercso could have made them in accordance with Dr. Place's designs and instructions. The Court merely notes that the references in Dr. Place's March 4, 1991 memorandum tend to corroborate Mr. Kercso's claims of inventorship.

February 27, 1991. The locking mechanism, which prevents the accidental ejection of the pellet of medication, is not disclosed in Exhibits 10A, 10B or 10D. Since Mr. Kercso has testified that he designed the locking mechanism at the same time that he conceived the "plunger" design between February 10 and 20 of 1991, genuine issues of material fact clearly remain for jury determination. Therefore, the motion for summary judgment regarding the invention of the "plunger" device and the locking mechanism disclosed in the '391 patent (First Cause of Action), is DENIED.

### Analysis regarding inventorship of the '535 patent

■ The Court also denies Counterclaim defendants' motion for summary judgment on the "tulip" design disclosed in claim 19 of the '535 patent. Counterclaim defendants contend that Dr. Place conceived of the "tulip" design in a brainstorming session with Mr. Wilson in either late June or early July of 1991. Dr. Place and Mr. Wilson then walked down to Mr. Stone's office to explain the alternate design to him. He apparently expressed the opinion that the design would effectively avoid the Voss patent and asked for an engineering drawing. According to Counterclaim defendants, Mr. Kercso was contacted merely to render the requested drawing.

Mr. Kercso, on the other hand, claims that Mr. Wilson requested his assistance in designing an alternate design during a lunch meeting in either late June or early July of 1991. Counterclaim defendants do not dispute that the lunch meeting took place. Mr. Kercso then designed the "tulip" device in the following days or weeks. He and his wife invited Dr. Place and Mr. Wilson to their house to view the design on July 22, 1991. The scale drawing of the "tulip" device, which is dated July 22, 1991, is signed by Mr. and Mrs. Kercso and Dr. Place under the handwritten notation, "Reviewed and Understood." The parties dispute the meaning of the signatures.

The facts surrounding the invention of the "tulip" design are heavily disputed. Since the determination of whether Mr. Kercso actually invented the "tulip" design will de-

pend heavily on the jury's evaluation of the parties' credibility, the motion for summary judgment regarding the invention of the "tulip" design (Second Cause of Action) is DENIED.

### Analysis regarding invalidity and unenforceability claims

■ Counterclaim defendants also request summary judgment on Mr. Kercso's invalidity and unenforceability claims for declaratory relief set forth in the First and Second Causes of Action. Their motion is based on Mr. Kercso's lack of standing to challenge the validity and enforceability of the '391 and '535 patents since he is not accused of infringing the patents. Counterclaim defendants' argument has merit and Mr. Kercso has not opposed this aspect if the motion, but it should nevertheless be denied in light of the *Stark* decision. In *Stark,* the Federal Circuit held that if the inventorship challenger merely proves that he is a co-inventor of the patent-in-suit, instead of the true sole inventor, then the patent cannot be enforced because of the inequitable conduct of his co-inventors. *Stark,* 119 F.3d 1551, 1556–57. The Federal Circuit explained its holding as follows:

> Stark seeks to escape the taint of his alleged co-inventor's purported misconduct. Stark insists, that where his co-inventors have acted inequitably, the patent should be unenforceable only to the inventors who acted with deceptive intent. 37 C.F.R. § 1.56 (1996) precludes persons guilty of inequitable conduct from enforcing any rights under the patent. Stark argues that while AMI's inequitable conduct may preclude its enforcement of the patent, Stark remains eligible to enforce the patent. However, in this context, if unenforceable due to inequitable conduct, a patent may not be enforced even by "innocent" co-inventors. One bad apple spoils the entire barrel. Misdeeds of co-inventors, or even a patent attorney, can affect the property rights of an otherwise innocent individual. *See Molins PLC v. Textron, Inc.,* 48 F.3d 1172, 1178 n. 6, 33 U.S.P.Q.2d 1823, 1826 n. 6 (Fed.Cir.1995). In that case, Stark might retain a state

law action against AMI, *but the patent would not be enforceable by any party.* *Id.* at 1556 (emphasis added). Therefore, Counterclaim defendants' motion for summary judgment on the invalidity and unenforceability claims is DENIED.

## V. CONCLUSION

For the reasons set forth above, Counterclaim defendants' motion for summary judgment regarding the inventorship issues in this action is DENIED.

IT IS SO ORDERED.